# UNION TRUST COMPANY OF MARYLAND
## *v.* ALFRED TYNDALL

[No. 93, September Term, 1980.]

*Decided April 20, 1981.*

The cause was argued before Murphy, C. J., and Smith, Digges, Eldridge, Cole, Davidson and Rodowsky, JJ.

*Jerome M. Bloom,* with whom were *Paul, Perry & Bloom* on the brief, for appellant.

No brief filed for appellee.

Smith, J., delivered the opinion of the Court.

We granted the writ of certiorari in this case in order that we might resolve conflicts said to exist among circuit courts (on appeal from the District Court) as to whether the assignee of a seller under Maryland's Retail Installment Sales Act, Code (1975, 1977 Cum. Supp.) §§ 12-601 to 12-636, Commercial Law Article (the Act), is entitled after a sale pursuant to § 12-626 to recover the full finance charge to the original date of maturity of the contract or whether the finance charge must be recomputed as is done under § 12-620 in the event of a prepayment. We hold to the latter view. Hence, we shall affirm.

On July 27, 1977, appellee Alfred Tyndall purchased a 1977 Oldsmobile. At that time he executed an installment sale agreement which was assigned to appellant, Union Trust Company of Maryland. Since the cash price of $7,925.42 was less than the $12,500 amount specified in § 12-601 (j), the transaction was subject to the Act. To the cash price was added certain insurance and other costs permitted under the Act. This brought the amount financed or the unpaid balance to $9,757.98. The contract was to be paid in forty-eight monthly installments. Hence, a finance charge of $3,317.70 was added. The annual percentage rate was stated as 15.17%. After making his first payment almost one month late, Tyndall paid each month up through May 1978, but not on time. He said he found himself unable to meet the payments. Accordingly, a surrender was arranged on July 27, 1978, when he executed a voluntary repossession agreement. A private sale of the vehicle to the highest of three bidders was effected. Union Trust charged him for

storage fees of $46 and allowed him life and health insurance rebates totalling $595.39. It then computed the balance due under the contract as $4,874.60.

Union Trust filed suit against Tyndall in the District Court. It claimed $4,874.60 plus attorney's fees of $731.19 (15%). Tyndall was not represented by counsel. Without giving notice of intention to defend and demand for proof as required by Maryland District Rule 302, he appeared in court objecting to the claim. He stated, "[T]hey sold the car for what — the money that was borrowed. But they charged me with the interest." The matter was rescheduled for trial. At that time Judge Kardash refused to allow the full amount of the claim. He relied, in part, upon an earlier decision of his which had been affirmed on appeal in the Circuit Court for Baltimore County in an opinion by Chief Judge Raine. Judge Kardash said, "[T]he court holds that when you take that chattel and sell it, the contract is then at an end, and all you are entitled to is the interest as of the date of sale that has been earned. I can't make it any plainer than that . . . ."

Union Trust appealed to the circuit court. There Judge Sfekas filed a well-reasoned opinion in which he quoted from the earlier opinion by Judge Raine, to which we have referred, and cited and quoted from *Block v. Ford Motor Credit Company,* 286 A.2d 228 (D.C. 1972). The latter case involved a Maryland contract. The District of Columbia Court of Appeals applied what it understood would be Maryland law were the decision before us. Judge Sfekas said, "[T]he bank is entitled to receive only the finance charge it earned as of the date of the sale, the event which terminated the contract."

Union Trust in its petition for the writ of certiorari represented to us that the decision in the District Court was contrary to that rendered by another judge in the same county and contrary to District Court decisions in Baltimore City, Anne Arundel County, Carroll County, Harford County, Howard County, Prince George's County, and Montgomery County. We granted the writ that we might finally decide the matter.

In reaching our decision here we shall to a large degree be guided by the principles of statutory construction. Hence, we note those applicable to this case which were set forth in *Police Comm'r v. Dowling,* 281 Md. 412, 418-19, 379 A.2d 1007 (1977). They are that the cardinal rule of statutory construction is to ascertain and carry out the real legislative intent; in determining that intent the Court considers the language of an enactment in its natural and ordinary signification; a corollary to this rule is that if there is no ambiguity or obscurity in the language of the statute, there is usually no need to look elsewhere to ascertain the intent of the General Assembly; a court may not insert or omit words making a statute express an intention not evidenced in its original form; absent a clear indication to the contrary, a statute, if reasonably possible, is to be read so that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless, or nugatory; and the General Assembly is presumed to have had, and acted with respect to, full knowledge and information as to prior and existing law and legislation on the subject of the statute and the policy of the prior law. A number of cases were cited in *Dowling* in support of those propositions. *See also Vallario v. State Roads Commission,* 290 Md. 2, 426 A.2d 1384 (1981); *Department of Public Safety v. LeVan,* 288 Md. 533, 544-45, 419 A.2d 1052 (1980); *Dorsey v. Beads,* 288 Md. 161, 175-76, 416 A.2d 739 (1980); and *Messitte v. Colonial Mortgage Serv.,* 287 Md. 289, 293-94, 411 A.2d 1051 (1980).

The Maryland Retail Installment Sales Act was enacted by Chapter 851 of the Acts of 1941, possibly as a result of the research paper on "Retail Instalment Selling" prepared by Charles Mindel, Esq., and submitted to the Legislative Council in September 1940. In the intervening forty years the Act has been before this Court but very few times.

The Act obviously is to protect unsophisticated buyers. Under § 12-605 at or before the time when the buyer signs an installment sale agreement the seller shall deliver to him an exact copy of it. If the seller does not sign the copy and if within fifteen days after the buyer signs the installment sale

agreement the seller does not deliver to the buyer a copy of it signed by the seller, the installment sale agreement and the instruments signed by the buyer are void without any action by the buyer. The seller then is required immediately to refund to the buyer all of his payments and deposits. Until the buyer signs such an agreement and receives a copy of it signed by the seller, he has an unconditional right to cancel it and to receive immediate refund of all payments and deposits made under the contract. His request for the refund operates as a cancellation of the agreement. An acknowledgment of delivery of a copy of the agreement is required to be printed on the contract in 12-point type or larger.

A number of items are required by § 12-606 to be disclosed in the agreement. These include the names and addresses of the parties; the cash price; all charges for delivery, installation and repair of or other services to the goods which are included in the installment sale agreement and which are separate from the cash price; the amount of the down payment; description of all goods sufficient to identify them; the cost to the buyer of any insurance; the amount or extent of the insurance; the expiration date of the insurance; the party to whom the insurance is payable; if the goods sold include a motor vehicle, a definite statement in 12-point bold type or larger as to whether the insurance includes coverage for personal liability for property damage caused to others; the principal balance owed; the finance charge stated as a sum in dollars; the time balance owed; and a statement as to any collateral security taken for the buyer's obligation. That section requires a notice to the buyer "in 12-point bold type or larger, directly above the space reserved in the agreement for the signature of the buyer" of the fact that he is entitled to a copy of the agreement at the time he signs it and certain of his rights, including the right "[t]o require, under certain conditions, a resale of the property, if repossessed."

Section 12-607 enumerates a number of provisions not allowed in installment sale agreements. These include blank spaces to be filled in after the agreement is signed (other than "further serial numbers or other identifying marks on

the goods [to] be inserted in the agreement on delivery of the goods"), authority to confess judgment, an assignment or order for payment of wages, and "[a] provision for repossession of the goods or for the acceleration of the time when any part or all of the time balance becomes payable, *if the condition of the repossession or acceleration is that the holder considers himself insecure . . . .*" (Emphasis added.)

Limitations on the amount of the finance charge which may be imposed on the sale of a motor vehicle are set forth in § 12-609. At the time applicable to this transaction the finance charge on a new motor vehicle was limited to "$9 per $100 per year on the principal balance . . . ." The maximum finance charge for consumer goods is set forth in § 12-610. The method of computing finance charges is specified in § 12-611.

A buyer of consumer goods is granted by § 12-612 the right to "prepay at any time, without penalty, all or part of the outstanding balance . . . ." The section then states that if a buyer pays the balance in full before maturity, "the holder immediately shall refund to him a portion of the finance charge . . . ." It then goes on to provide for the method of computation of the refund.

Insurance is covered in § 12-613. Subsection (c) requires that a copy of the insurance policy or the owner's certificate together with certain information relative to the charges be delivered or mailed to the buyer within twenty-five days after the delivery of the goods. Then subsection (f) states that if the seller or the assignee does not comply with the requirements of subsection (c), the buyer may deduct from the amount of any payment the full amount charged to him for the insurance. If he does not do that the holder is required to credit the amount charged against the last installment or installments under the agreement.

Section 12-614 forbids the holder of the agreement from "directly or indirectly" contracting for or charging a buyer additional sums or fees except as specified in that section for such things as court costs and expenses in recovery of possession of the goods.

If in addition to his down payment a buyer is required under an installment sale agreement to make a payment to the seller before the seller is obliged to deliver the goods sold, then § 12-615 (a) states that "the buyer may cancel the installment sale agreement before delivery or tender of the goods by the seller" with a requirement on the seller to refund to the buyer within ten days after notice of the cancellation an amount equal to at least 90% of all payments made by the buyer under the agreement, including any down payment.

Section 12-620 states, "Notwithstanding any provision of an installment sale agreement to the contrary, a buyer may prepay at any time, without penalty, all or any part of the unpaid time balance payable under the installment sale agreement." It then goes on to spell out the method for computing a refund of part of the finance charge.

Section 12-621 requires a holder within ten days after receipt of a written request from the buyer to deliver or mail to him a statement of the account including the number of installments payable in the future and the amount and time of each. This statement is to be supplied free of charge unless one has been supplied within the preceding sixty days. In that event a fee of 50 cents may be charged.

If the agreement so provides, then § 12-623 permits the charging of an attorney's fee "not exceeding 15 percent of the amount due and payable under the agreement" in connection with collection after default. This fee may be collected only if the agreement is referred for collection to an attorney who is not a salaried employee of the holder.

The matter of repossession is covered in § 12-624, including the permitted methods of repossession. It requires the holder within five days after the repossession to send to the buyer a notice of such matters as his right to redeem, his right to require resale, and his liability for a deficiency.

The holder is required by § 12-625 (a) to retain the repossessed goods for fifteen days after the giving of the notice required by § 12-624. It then goes on to spell out the requirements for redemption, that the buyer shall tender the

amount due under the agreement at the time of redemption, "without giving effect to any provision which allows acceleration of any installment otherwise payable after that time"; shall tender performance of any other promise for the breach of which the goods were repossessed; and, under certain circumstances, shall pay the actual and reasonable expenses of retaking and storing the goods. The section contains a provision making it inapplicable if the buyer was guilty of fraudulent conduct or the like.

Unless there is a resale of repossessed goods under § 12-626, then under § 12-627 all obligations of the buyer under the agreement are discharged and the holder may retain the goods as his own property without obligation to account to the buyer. Thus, prior to the enactment of Chapter 806 of the Acts of 1965 this case would not be before us. The predecessor of § 12-626 from its original enactment in 1941 until 1965 provided as § 12-626 (a) now provides that the holder was required to sell repossessed goods at public auction if the buyer had paid at least 50% of the cash price and within the fifteen day period provided in the notice in § 12-625 (a) requested in writing that the goods be so sold. In the latter event the present section, as did the former, requires a deposit in a specified sum intended to cover the cost of sale. The buyer is required to have notice of the time and place of the sale which is to take place within thirty days of his request. The former section then went on to cover the application of proceeds of sale with the proviso that the buyer was to be liable for any deficiency. Section 12-626 (e) now covers the application of proceeds of a public sale made under the provisions of § 12-626 (a) and "[a]ny other bona fide public or private sale of goods which had a cash price in excess of $2,000 at the time of their purchase by the buyer, if the buyer has not paid at least 50 percent of the cash price of the goods or if he has paid that amount but has not requested a public sale under subsection (a) . . . ." They are to be allocated to the actual and reasonable cost of the sale, the actual and reasonable cost of retaking and storing of the goods, and "[t]he unpaid balance owing under the agreement at the time the goods are repossessed." It then goes on to

specify that if the agreement provides for liability for a deficiency and the sum produced by the sale is insufficient to pay for all of these items, the buyer is liable for the deficiency. This requirement and the statement relative to a sale where the cash price paid was in excess of $2,000 but the buyer had not paid at least 50% of the cash price of the goods were added by the 1965 amendment. The only provision for sale prior to that amendment was where the amount paid was more than 50%, the buyer requested sale, and the buyer secured the expense of sale. If this was not done, then under § 12-627 there was no further obligation on the part of the buyer. This is why we say that prior to 1965 this case could not have arisen.

Yet another protection to consumers written into the Act is that in § 12-628 stating that if as a part of an installment sale a promissory note is taken by a seller or a sales finance company the note shall refer to the agreement out of which it arises and if the note is assigned it is subject to all defenses which the buyer might have asserted against the seller or sales finance company, except that an acknowledgment by the buyer of delivery of a copy of the agreement pursuant to § 12-605 is conclusive proof of the delivery in favor of an assignee of the note without actual knowledge to the contrary. Yet another protection is found in § 12-629 providing that no act, agreement, or statement of a buyer in an agreement may constitute a valid waiver of any benefit or protection provided to him under the Act. Then in § 12-630, concerned with violations of the Act, subsection (d) states that if an instrument contains any provision prohibited by § 12-607, e.g., one for confession of judgment, "that provision is void and the holder may not collect or receive from the buyer, in connection with the transaction to which the instrument relates, any finance, delinquency, or collection charge."

We have referred extensively to the Act in order that it may be seen that it is a carefully constructed and carefully thought out piece of consumer protection legislation enacted by the Maryland General Assembly many years before the more recent concerns relative to consumer protection. This

statutory scheme has an important bearing on our decision here.

Union Trust points out that "finance charge" is defined in § 12-601 (i) as "the amount in excess of the cash price of the goods sold, agreed on by a seller and a buyer, to be paid by the buyer for the privilege of purchasing the goods under an installment sale agreement." From this it argues, citing *Rothman v. Silver,* 245 Md. 292, 226 A.2d 308 (1967), and *Falcone v. Palmer Ford,* 242 Md. 487, 219 A.2d 808 (1966), that since "finance charges are amounts payable for the right to purchase goods over a period of time and not interest which is paid for the privilege of borrowing money," they "are not to be treated as interest, and therefore the general rules pertaining to the payment and refund of interest are not applicable." It is true that our cases have differentiated between finance charges and interest. This is because interest, a term defined in Code (1975), § 12-101 (e), Commercial Law Article, is "any compensation directly or indirectly imposed by a *lender* for the extension of credit for the use or forebearance of money, including any loan fee, origination fee, service and carrying charge, investigator's fee, time-price differential, and any amount payable as a discount or point or otherwise payable for services." (Emphasis added.) The finance charge arises in the case of an installment sale as the additional sum which the seller charges by reason of the delay in payment. Both interest and finance charges, however, represent that which one is obliged to pay as "rent" for the money involved. One represents compensation for sums advanced by a lender. The other represents additional compensation to a seller over and above the cash price which is not immediately paid. If he is to stay in business he must earn a return on his capital, providing, of course, that he has sufficient capital to finance such purchases. The more conventional situation, however, is where he has arranged to assign the installment sale agreement to a bank or finance company. It, of course, must be compensated for the use of its capital. The similarity between the two situations is readily perceived when one recognizes that had Tyndall gone directly to Union Trust

and borrowed the sum necessary for the purchase of his Oldsmobile, executing a security agreement therefor, it would have been interest, not a finance charge, which he would have been obliged to pay, although his payments might have been exactly the same. See the many cases discussed and analyzed in Annot., 63 A.L.R.3d 10 (1975), relative to the right of a holder of commercial paper to interest or finance charges applicable to a period after acceleration of maturity of an obligation because of a debtor's default.

As we have previously pointed out, the finance charge is not to be in excess of a given number of dollars "per $100 per year on the principal balance" and is set forth in the contract. The statute obviously contemplates that the longer the period of time over which the deferred balance will be paid, the greater is to be the total amount of the finance charge. If the buyer elects to prepay all or any part of the unpaid time balance he is entitled to a readjustment of the finance charge. As we have indicated, § 12-626 (e) (2) provides for the order of payment of the proceeds of sale including "[t]he unpaid balance owing under the agreement at the time the goods are repossessed." Then subsection (e) (3) provides that after application of the proceeds and deposit in accordance with ¶ (2) of that subsection, "any remaining balance shall be paid to the buyer." It surely must have been contemplated by the General Assembly in this consumer protection statute that the balance to be satisfied would be determined by treating the sale and resulting payment as a prepayment under § 12-620. To hold otherwise would be to reach an absurd, unreasonable, or illogical result, one inconsistent with common sense. Our cases tell us this should be avoided. See, e.g., *Cider Barrel Mobile Home v. Eader,* 287 Md. 571, 583, 414 A.2d 1246 (1980); *Curtis v. State,* 284 Md. 132, 149, 395 A.2d 464 (1978); *Grosvenor v. Supervisor of Assess.,* 271 Md. 232, 242, 315 A.2d 758 (1974); and *Coerper v. Comptroller,* 265 Md. 3, 6, 288 A.2d 187 (1972). Having reached that point in our reasoning, it certainly must follow that the sum to be satisfied and hence the sum used in determining the deficiency for which the buyer is liable under § 12-626 (e) (4) if the proceeds and deposits

are insufficient must be one determined using the same type of computation. This was a four year contract. Under Maryland Rule 642 judgments bear interest. To hold as Union Trust would have us hold would permit the potentially absurd result of a default, repossession, and judgment for the balance within several months of the execution of the contract, thereby permitting interest on a judgment the amount of which would include more than three years of unearned finance charges. Given the fact that whether one talks in terms of finance charges or interest one is speaking economically in terms of compensation for the use of capital and the further fact that this statute obviously was intended to protect unsophisticated consumers such as Tyndall (who confessed that he had trouble understanding the contract), we hold that when the General Assembly in 1965 changed the statute so as to render buyers such as Tyndall potentially liable for a deficiency it could not and did not intend to make such persons responsible for unearned finance charges. Accordingly, it follows that Judges Kardash, Sfekas and Raine were correct in their divination of legislative intent and the judgment here must be affirmed.

*Judgment affirmed; appellant to pay the costs.*