THE GUARDIAN LIFE INSURANCE COMPANY OF
AMERICA *v.* INSURANCE COMMISSIONER
OF THE STATE OF MARYLAND ET AL.

[No. 168, September Term, 1981.]

*Decided June 29, 1982.*

630

The cause was argued before MURPHY, C. J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

*David M. Funk,* with whom was *Roger D. Redden* on the brief, for appellant.

*Carol A. Joffe,* with whom was *Daniel E. Toomey* on the brief, for appellee The Maryland Foundation of College Park, Inc., and *Michael L. Cohen* and *Thomas P. Barbera, Assistant Attorneys General,* on the brief, for appellee The Insurance Commissioner.

MURPHY, C. J., delivered the opinion of the Court.

This case involves a claim for benefits under a policy of group health insurance written by The Guardian Life Insurance Company of America (Guardian), a New York corporation licensed to do business in Maryland. The policy covers employees of Data Technology Industries, Inc. (DTI), a Maryland corporation with its principal place of business in this State. The basic issue is whether charges incurred by two DTI employees for outpatient mental health treatment — charges not covered under the terms of the Guardian policy — must nevertheless be paid by the insurer because of the provisions of Maryland Code (1957, 1979 Repl. Vol.), Art. 48A (the Insurance Code), § 477E, which mandate the inclusion of coverage for such outpatient treatment in every group health insurance policy "delivered or issued for deliverance" in Maryland. Guardian declined to pay the charges, contending that the policy was issued and delivered in Rhode Island, and consequently it was required to make payment only to the extent that the outpatient charges were covered by the benefit provisions of the policy.[1] The Maryland Insurance Commissioner, and on appeal from his order, the Baltimore City Court, concluded that Guardian

---

1. Section 477E then required outpatient benefits for mental health treatment to be provided "at a rate which is not less than 50 percent of the benefits which the policy provides for other types of illness." The Guardian policy did not comply with this minimum coverage standard.

was required to pay the benefits mandated by § 477E to the Maryland Foundation of College Park, Inc. (the Foundation), which had provided the outpatient treatment to DTI's employees.[2] Guardian appealed to the Court of Special Appeals. We granted certiorari prior to decision by that court to consider the important issues of statutory construction presented in the case.

I

"Group health insurance" is defined in § 471 of the Insurance Code as "that form of health insurance covering groups of persons [as thereafter defined in seven subsections] . . . and issued upon the following basis:

(1) . . .
(2) . . .
(3) Under a policy issued to the trustees of a fund established by two (2) or more employers in the same or related industry . . ., which trustees shall be deemed the policyholder, to insure employees of the employers . . . ."

Section 472 requires that "[e]ach such group health insurance policy" contain a provision, among others:

"that the insurer will furnish to the policyholder for delivery to each employee or member of the insured group, a statement in summary form of the essential features of the insurance coverage of such employee or member and to whom benefits thereunder are payable."

2. Section 378 of the Insurance Code provides:

"Any insurance policy, rider, or endorsement hereafter issued and otherwise valid which contains any condition or provision not in compliance with the requirements of this article, shall not be thereby rendered invalid but shall be construed and applied in accordance with such conditions and provisions as would have applied had such policy, rider, or endorsement been in full compliance with this article."

Section 477A provides that insurers who "substantially conform" their group health policies to any of the groups described in § 471 may solicit coverage in Maryland without prior approval of the Insurance Commissioner. Section 377A of the Insurance Code provides that no health insurance policy may be "delivered or issued for delivery in this State" if it contains, *inter alia,* a provision that the contract is to be construed according to the laws of another state, or that the rights and obligations of the insured are governed by other than the laws of Maryland.

## II

The record discloses that on March 27, 1967, a trust agreement was executed between Guardian, as settlor of the trust, and the Rhode Island Hospital Trust Company (the Bank), as trustee. The stated purpose of the agreement was to implement "a group insurance plan for the benefit of employees of employers who become participants in accordance with the terms ... [of the trust agreement] through the utilization of an insurance fund created by the participants . . . ." Article II of the trust agreement entitled "Creation of the insurance fund by participants," identified the "participants" as those employers in the services industry who agreed in writing to be bound by the agreement's provisions and who were approved by Guardian for insurance coverage under a group insurance policy "held by the trustee." By its terms, the trust agreement required each participating employer to pay into the insurance fund, either to the trustee, or to Guardian if the trustee appointed the insurer as its collection agent, amounts sufficient to pay premiums for the insurance coverage acquired, together with an allocable share of the trustee's administrative charges. The agreement specified that the trustee accepted the trust in Rhode Island and that all questions pertaining to its validity, construction and administration would be determined in accordance with the law of Rhode Island. Title to the insurance fund under the agreement was vested in the

trustee. The agreement provided that the insurance fund would be disbursed only to pay premiums for group insurance procured by the trustee and for reasonable charges made by the trustee. The agreement further provided that the trustee, "as the policyholder," would procure group insurance of various specified types through Guardian. Guardian was empowered by the agreement to remove the Bank as trustee upon thirty days' written notice. Finally, Article IV provided that requests for participation from employers "shall be made by executing an adoption agreement binding said employer to the terms of this agreement and to the terms of the insurance policy or policies issued hereunder," subject to the approval of the insurer.

On June 1, 1967, Guardian issued Group Insurance Policy No. 1 (the master policy), identifying the "policyholder" as the Bank acting as "Trustees of the Services Industry Insurance Trust Fund." The master policy states on its cover page that it was delivered in Rhode Island and is governed by the laws of that state; that premiums are payable by the "policyholder" and that benefits are as specified "in the employer rider applicable to each participating employer"; that "[a]n eligible employer may become a participating employer by filing, through the trustees, with the home office of the insurance company, an agreement executed by the employer adopting the terms of the trust agreement and by receiving the insurance company's approval, in writing, of its inclusion as a participating employer"; and that the employer becomes a "participating employer" in accordance with the terms of the employer rider, which forms a part of the master policy and which "contains details of the plan of insurance pertaining to the employees of ... [the] participating employer." The master policy provides under the heading "Schedule of Insurance and Premium Rates" that "[t]his group policy, together with any amendments thereto, contains all the insurance coverages which may be provided by the employer rider." Under heading of "The Contract" the policy specifies that it, and any riders and amendments thereto, "and the application of the pol-

icyholder, a copy of which is attached hereto or endorsed hereon and made a part hereof, and the individual applications, if any, of the employees constitute the entire contract between the parties." The policy provides under the heading "Employee Certificate" that Guardian "will issue to the policyholder, for delivery to each employee insured hereunder, an individual certificate which shall state the essential features of the insurance to which the employee is entitled and to whom the benefits are payable . . . ." The master policy further provides that the certificate shall not constitute a part of the policy. Then follows a lengthy recitation of the various group coverages available to participating employers, together with detailed information covering premium rates and provisions outlining the terms and conditions pursuant to which the insurance contracts are to be governed.

On February 21, 1973, DTI, having been solicited by a licensed Guardian agent in Maryland, completed an application for group health insurance on a form prepared by Guardian. The application contained a section entitled "Request for Participation in a certain trust agreement dated March 27, 1967"; the "request" was addressed to the Bank as trustee. It stated that DTI was engaged in the services industry and sought approval as a participant "in the Fund established by other Employers engaged in the same industry for the purpose of purchasing insurance for the benefit of their employees and requests the Trustee to apply to . . . Guardian . . . for inclusion under the Group insurance policy(s) issued to the Trustee for the plan(s) of insurance shown in Section 1 . . . ." DTI agreed in its application, among other things, to be bound by all terms of the trust agreement, all amendments thereto, and by all provisions of the policy issued to the trustees. In a section of the application marked "Home Office use only," appears this statement: "Policy governed by the laws of the State of Rhode Island."

Guardian issued an "Employer Rider" to DTI, effective June 1, 1973, setting forth the details of the plan of group health insurance which DTI had selected. The rider identified the "policyholder" as the trustee of the insurance

fund and the group policy as No. G-22970-I. A "certificate" in booklet form was thereafter issued to each of DTI's insured employees, explaining the benefits provided by DTI's insurance plan. The certificate stated that it was not a part of the "policy contract." It did not state that the described benefits were governed by Rhode Island law, nor did it reveal the involvement of the Rhode Island trustee in the acquisition of the group policy.

## III

Upon Guardian's refusal to pay the Foundation for outpatient mental health treatment rendered to the DTI employees, the Foundation filed a complaint with the Maryland Insurance Commissioner. It claimed that Guardian's limited outpatient benefits did not comply with the mandated coverage provisions of § 477E of the Insurance Code which were applicable to policies of group health insurance "delivered or issued for deliverance" to any person in this State. Guardian defended the claim on the ground that the coverage afforded to DTI's employees was based upon a policy issued to "trustees of a fund established by two (2) or more employers in the same or related industry," as authorized by § 471 (3); that this section provided that the "trustees shall be deemed the policyholder"; that because the policy was delivered to the trustees in Rhode Island, it was not "delivered or issued for deliverance" in Maryland, and therefore the mandated coverage provisions of § 477E had no application to the Guardian policy.

At the evidentiary hearing before the Commissioner, the testimony of Robert Dobbins, Vice President of Guardian, was introduced. He indicated that Guardian had been writing group coverage in the form of multiple employer trust policies since 1964; that Guardian maintains 26 such trust plans throughout the country, with Rhode Island Hospital Trust Company acting as trustee in each instance "because of [its] expertise in handling trusts"; and that in Maryland approximately 376 employers obtained coverage

for their employees pursuant to this arrangement, resulting in annual premium payments of $2,585,000. Dobbins explained that a multiple insurer trust is established to cover employers in a related industry so as to afford benefits to small groups that could not otherwise qualify for available high risk benefits. The trust arrangement, he said, was established to permit the insurer "to pass on to participating employers" savings resulting from the reduction in administrative costs by eliminating the need to issue a separate policy to each employer. Dobbins testified that were it not for the multiple employer trust vehicle, Guardian could not afford to underwrite small employer groups. He said that Guardian does not use this form of group coverage to avoid state regulation but rather as "a simplified plan of insurance which we can offer to most small employers in the fifty states."

Dobbins testified that the master policy is not delivered to the participating employer, but only to the trustee as the policyholder. According to Dobbins, an employer receives only a "participation rider," which he referred to as the "policy" for the participating employer. He acknowledged that the benefits and coverages are set forth in the employer rider which is in effect tailored to meet the needs of each individual employer.

Dobbins admitted that the trustee in the present case performs no administrative duty other than to serve as the holder of the master policy, for which it receives $450 annually. He stated that the trustee appointed Guardian as its collection agent and that all premiums are paid by the employers directly to the insurer. Dobbins acknowledged that Guardian's "in house" documents and internal memos indicate that DTI, and not the trustee, was the "policyholder" of Group Policy G-22970-I, which was delivered in Maryland. He stated, however, that the terminology used in these internal documents was not an accurate reflection of what actually occurred because the master policy, which is controlling, was not issued or delivered in Maryland, but in Rhode Island.

The Insurance Commissioner found that the sole function served by the Guardian/Bank Trust was "to receive and hold the so-called 'master policy' and it performs no other administrative functions"; that "the employers who obtain[ed] insurance through Guardian did not establish the trust and have no control over the trustees or the trust except to end their insurance coverage"; that consequently the trust vehicle was "not a trust established by two or more employers . . . as required by § 471(3)"; that "[t]he purpose of the trust and trust fund established by Guardian is to avoid mandated benefits"; that "the mandated benefits of § 477E . . . are applicable to the policy in question which is deemed to have been delivered in Maryland"; that "[n]otwithstanding actual delivery of the master policy to the trust in Rhode Island, the subsequent delivery of the rider, booklet, schedule and certificates, [to DTI in Maryland] constitute[d] sufficient delivery in this State for purposes of § 477E." The Commissioner ordered Guardian "to accept the claims in accordance with § 477E with the right to demand from the insured the proportionate amount of premium which would have been generated as a result of these two individuals."

On appeal, the Baltimore City Court (Greenfeld, J.) concluded that the trust and trust fund were illusory because the trustee's only function was to hold the master policy, while Guardian solicited the employers, issued the employer riders, billed for and collected the premiums, and handled all inquiries and claims — that "[a]ll of the work attendant to the insurance is done exclusively by Guardian." The court said that the legislature, in enacting § 471 (3), did not intend "to permit the creation of a totally non-functioning trust as a means to avoid regulation by the State insurance commissioner." It stated:

> "The preferred status given to multiple employer group health insurance trusts but not to other multiple employer group health insurance plans which also use a master policy device clearly indicates a legislative intent that the trustee plan must be one of substance rather than form."

In addition, the court held that § 471 (3) requires that the trust consist of a "fund" established by two or more employers; that no such "fund" exists because the premiums are paid by the participating employers directly to Guardian as the trustee's collection agent; that because § 471 (3) does not apply to the coverage in question, the trustee cannot be deemed "the policyholder" under § 471 (3); that as a consequence the "policy" must be deemed to have been issued to DTI in Maryland because the definition of that term in § 364 of the Insurance Code includes all "riders" and "endorsements" attached thereto; and, therefore, the policy having been delivered in Maryland, the mandated provisions of § 477E apply for the benefit of DTI employees.

## IV

In urging reversal of the judgment below, Guardian places reliance upon cases which espouse the general principle that the law governing a contract of group health insurance is that of the state where the master policy is delivered. *See, e.g., Boseman v. Connecticut General Life Ins. Co.,* 301 U.S. 196, 57 S. Ct. 686, 81 L. Ed. 1036 (1937); *Swanberg v. Mutual Ben. Life Ins. Co.,* 79 Ill. App. 3d 81, 398 N.E.2d 299 (1979); *Reger v. Nat. Ass'n of Bedding Mfrs., Etc.,* 83 Misc.2d 527, 372 N.Y.S.2d 97 (1975); *Lindstrom v. Aetna Life Insurance Company,* 203 N.W.2d 623 (Iowa 1973); 53 A.L.R.2d 1095; Restatement (Second) of Conflicts of Laws § 192, comment (h) (1971). Guardian asserts that the word "policy," in the context of group health insurance, and specifically as used in § 477E ("policy delivered or issued for deliverance" in Maryland), means the master policy of insurance delivered to the group policyholder. Guardian refers to § 364 of the Insurance Code, applicable to group health insurance, which defines "policy" to mean:

"the written instrument in which the contract of insurance is set forth, and includes all clauses, riders, endorsements and papers attached thereto or made a part thereof."

Under this definition, according to Guardian, a policy rider (*i.e.,* the employer rider in this case) is not itself the contract or policy of insurance because the rights and obligations of the parties are governed, not alone by the rider, but by the terms and conditions of the master policy, of which the rider is but one part. Guardian thus claims that since its master policy, inclusive of the DTI employer rider, was delivered to the trustee-policyholder in Rhode Island, and not to the participating employer in Maryland, the mandated benefit provisions of § 477E, applicable only to policies delivered in Maryland, are not within the coverage of the policy. Guardian emphasizes that § 471 (3) expressly sanctions the establishment of out-of-state multiple employer trusts and that, contrary to the holding of the lower court, the trust and trust fund in this case were created in strict compliance with the plain and unambiguous language of that section. The insurance trust fund was established, Guardian asserts, by two or more employers in the same or related industry, as required by § 471 (3), when participating employers, after accepting and agreeing to be bound by the terms of the trust agreement, became participants thereunder and made the required payments into the fund for the benefit of their employees.

The lower court was also wrong, Guardian argues, in concluding that the trust was illusory because the trustee's only duty was to hold the master policy in Rhode Island. Guardian contends that nowhere in the provisions of § 471 (3) is there any requirement that the trustee perform any particular duties. Guardian argues that to engraft any such requirement upon the statutory language, as was done by the lower court, violates the rule of statutory construction that inhibits courts from inserting language into a statute to make it express an intention not in accord with the literal meaning of the enactment. Guardian maintains that the lower court improperly viewed multiple employer trusts as a suspect form of coverage, notwithstanding their explicit approval in § 471 (3). Guardian acted pursuant to the provisions of § 471 (3), it claims, not to avoid state regulation but rather in full compliance with it.

Guardian points out that group health insurance policies are regulated under Subtitle 26 of the Insurance Code, which consists of §§ 471 through 477V; and that various of these sections expressly mandate the inclusion of particular types of coverage in out-of-state group health insurance contracts insuring Maryland corporations, residents, or workers; or require delivery in this State to employees of an informational "certificate" of insurance. For example, § 477F mandates coverage for optometrists' services, requiring that such coverage be provided in "[a]ll group health insurance policies, or any certificate thereunder, issued or delivered in this State, or issued to a group which is incorporated or has a main office located in this State, or covering persons who reside or work within this State . . . ." Sections 477-O and 477-P mandate coverage in every group health policy, respectively, for services of certified' social workers and for certain disabilities caused by pregnancy when the policy is issued or delivered in Maryland, or issued or delivered to an entity which is incorporated or has a main office in Maryland, or which covers any person who resides or works in this State. Unlike § 477F, these sections do not expressly encompass a "certificate" delivered in Maryland under a policy of group health insurance. Other sections limit the reach of mandated coverage in group health policies to those issued or delivered in Maryland. For example, § 477J, involving certain mandated maternity benefits, provides simply that every group health insurance policy "delivered or issued for delivery in this State" must include such benefits. To like effect, see § 477K (conversion privileges); § 477M (certain psychiatric care); § 477N (certain conversion rights); § 477R (certain services rendered by nurse midwife); § 477S (benefits for treatment of drug abuse); and § 477T (benefits for services rendered by certified nurse practitioner).

Guardian contends that the different wording of these Subtitle 26 sections clearly demonstrates the legislative intention to limit the availability of mandated benefits in some instances but not in others, based upon, *inter alia,* where the policy, or certificate, was delivered or to whom the

policy was issued or who was covered thereby. In this connection, Guardian points out that the legislature amended § 477E — the section here in issue — by ch. 726 of the Acts of 1981 (after the claims in this case arose) to require that outpatient mental health benefits be covered in all group health policies where a "certificate" of insurance had been delivered or issued for delivery in Maryland. The amendment attests to the fact, Guardian suggests, that § 477E did not formerly mandate the payment of such benefits in cases where, as here, the master group policy (which did not include the "certificate" as a part thereof) was not delivered in Maryland.

## V

Guardian's arguments, although well constructed and well presented, cannot prevail on the record in this case. Simply because a multiple employer trust is eligible for group health insurance under § 471 (3), and an out-of-state entity is authorized by that section to act in a trust capacity as the policyholder, is not alone determinative of whether, in the contemplation of the Insurance Code, the trust is one of substance or whether the policy issued to the trustee on behalf of the insured parties was "delivered" or "issued" for delivery in this State. As we have said countless times, the cardinal rule of statutory construction is to ascertain and carry out the legislative intention. *Vallario v. State Roads Comm'n,* 290 Md. 2, 426 A.2d 1384 (1981). In so proceeding, courts are enjoined to construe statutes in light of the declared legislative purpose, with the meaning of the plainest language being controlled by the context. *Union Trust Co. v. Tyndall,* 290 Md. 102, 428 A.2d 428 (1981); *Dept. of Tide. Fisheries v. Sollers,* 201 Md. 603, 95 A.2d 306 (1953). In other words, statutes should be construed with a view to the original intent and meaning of the legislature, bearing in mind the cause and necessity of the enactment, and that construction is to be applied which, accords with the actual intention of the makers. *Holy Cross Hosp. v. Health Ser-*

*vices,* 283 Md. 677, 393 A.2d 181 (1978); *Canal Co. v. Rail Road Co.,* 4 G. & J. 1, 152 (1832). Similarly fundamental is the rule that where a particular provision of a statute is part of a single statutory scheme the legislative intention must be gathered from the entire statute rather than from only one part. *In re Stephen K.,* 289 Md. 294, 424 A.2d 153 (1981); *Pennsylvania Nat'l Mut. v. Gartelman,* 288 Md. 151, 416 A.2d 734 (1980). Of course, a well-recognized counter-balancing rule is that a court must not surmise a legislative intention contrary to the plain language of a statute. *See Amalgamated Ins. v. Helms,* 239 Md. 529, 212 A.2d 311 (1965).

As previously indicated, the public policy of this State, as set forth in § 377A of the Insurance Code, prohibits the delivery in Maryland of any health insurance policy which contains a provision that the policy is governed by the laws of another state or that the insured's rights and obligations are governed by other than the laws of Maryland. Manifestly, this clear expression of the public policy of the State was designed to protect Maryland citizens in their dealings with insurance companies. In light of this policy, we think it self-evident that the legislature did not intend in § 471 (3) to sanction a practice by insurance companies which would permit foreign rather than Maryland law to govern group health contracts written for Maryland employers and insuring Maryland employees by the simple expedient of having the master policy delivered to an out-of-state entity functioning, in effect, as the agent or alter ego of the insurance company itself.

That which necessarily is implicit in a statute is as much a part of it as that which is expressed. *Williams and Fulwood v. Director,* 276 Md. 272, 347 A.2d 179 (1975), *cert. denied,* 425 U.S. 976, 96 S. Ct. 2178, 48 L. Ed. 2d 801 (1976); *Chillum-Adelphi v. Board,* 247 Md. 373, 231 A.2d 60 (1967); *Restivo v. Princeton Constr. Co.,* 223 Md. 516, 165 A.2d 766 (1960). Multiple employer trusts under § 471 (3) are generally formed to enable small employers to pool their financial resources, take advantage of economies of scale,

and thereby obtain more extensive and less expensive insurance coverage for their employees. *See* 65 Minnesota Law Review 459. That § 471 (3) contemplates a bona fide trust, with the participating employers rather than the insurance company as the beneficiary of the trust is, we think, implicit in the provisions of this section.

It is conceded that Rhode Island has no laws applicable to or regulatory of group health insurance contracts. This fact, rather than the claimed "expertise" of the Rhode Island trustee, seemingly dictated the insurer's unilateral choice of the trustee, since Guardian admits that the trustee performs no administrative functions beyond acting as the recipient of the master policy. In effect, therefore, the trustee is little more than a "maildrop" in furtherance of a marketing device contrived by Guardian, of no benefit to the participating employers for whom the trust was established. The trust, therefore, is essentially one in name only, an artifice which serves no legitimate purpose in reducing the cost of administering the insurance plan for the participating employer because Guardian itself performs all the administrative duties, including by delegation from the trustee, the collection of all premiums for inclusion in the trust fund. In actuality, because Guardian itself is in total control of the trust and trust fund, the trustee is, at best, an entity without substance and cannot therefore function as the "policyholder" under the provisions of § 471 (3).

The master policy was initially delivered to the Rhode Island trustee in 1967. That document merely listed the available benefits offered by the insurer, together with the general terms and conditions upon which the insurance could be obtained by participating employers. In its original form, therefore, the master policy did not insure anyone, not being within the definition of "insurance" as set forth in § 2 of the Insurance Code, *i.e.:*

> " 'Insurance' is a contract whereby one undertakes to indemnify another or pay or provide a specified or determinable amount or benefit upon determinable contingencies."

It was not until six years after the initial delivery of the master policy to the Rhode Island trustee that DTI entered into a contract of insurance with Guardian — a contract evidenced by the issuance of the employer's participation rider which outlined the essential features of the coverage acquired by DTI and the premium to be paid therefor. Although the rider was appended to and made a part of the master policy held by the Rhode Island trustee, nevertheless it was itself a contract of insurance within the meaning of § 2 of the Insurance Code and was therefore a "policy" of group health insurance within the contemplation of § 477E. A copy of the rider, which contained a group number different from that carried on the master policy, was delivered to DTI in Maryland. In the circumstances of this case, we hold that Guardian's "policy" with DTI, having been delivered in Maryland, obligates the insurer to pay the mandated benefits outlined in § 477E. In so concluding, we have carefully considered but find no merit in Guardian's argument that the wording of various sections within Subtitle 26 of the Insurance Code, contrasted with that of § 477E, and the 1981 amendment thereto, calls for an interpretation of legislative intention different than that we have reached today.

*Judgment affirmed, with costs.*