**In re Rhoda JUNGKURTH, Debtor.**

**Rhoda JUNGKURTH, Plaintiff,**

v.

**EASTERN FINANCIAL SERVICES, INC., Defendant.**

**In re Joyce GRUBER, Debtor.**

**Joyce GRUBER, Plaintiff,**

v.

**EASTERN FINANCIAL SERVICES, INC., Defendant.**

**Bankruptcy Nos. 86–05358S, 86–04705S. Adv. Nos. 87–0015S, 87–0016S.**

United States Bankruptcy Court, E.D. Pennsylvania.

May 27, 1987.

Henry J. Sommer, Philadelphia, Pa., for debtors.

Leonard Spear, Philadelphia, Pa., for Eastern.

Edward Sparkman, Philadelphia, Pa., Chapter 13 standing trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION AND PROCEDURAL HISTORY

The two adversarial proceedings to determine the amount of the common Defendant's secured and allowed claims against the Debtors, per 11 U.S.C. §§ 502(a), 506(a), and for damages, consolidated for trial, which are addressed in this Opinion present us with issues which involve interpretation of several provisions of Pennsylvania consumer protection legislation relating to usury and unfair trade practices which we note, as we did in our recent Opinion in *In re Russell, Russell v. Fidelity Consumer Discount Company,* 72 B.R. 855, 865, 869, 871 (Bankr.E.D.Pa., 1987), have not been the subject of many reported decisions and hence are virtually matters of first impression.

Interpreting two provisions of the Pennsylvania law defining and regulating usury, 41 P.S. §§ 301(f)(v) and 405, generally known as "Act 6 of 1974" (and hence referred to hereinafter as "Act 6"), and its interpretive Regulations promulgated by the Pennsylvania Department of Banking, we find that the transaction in issue is a "business loan" outside the scope of the interest rate limitation of Act 6, but involves "residential mortgage" obligations and is hence within the scope of that Act's prohibition on prepayment penalties. Accepting the Debtors' implicit claim that the actuarial method is the correct method for calculating a prepayment rebate in such a way as to not penalize a borrower, we hold that only $504.66 was due on the loan after a large prepayment on the loan in issue.

Following our decision in *Russell* on this point, we hold that the Pennsylvania version of a law punishing "unfair or deceptive acts or practices," the Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, et seq. (referred to hereinafter by its generic designation as "UDAP"), is to be broadly construed and does apply to this transaction even though it involves a "business loan." We further find that the aura of overreaching and unconscionability which pervaded the transaction in its inception, particularly the lack of explanation of the original loan documents and the misrepresentations made by the lender when it obtained the lump sum payment, and the lender's collection activity against the two ill and unsophisticated female Debtors, justifies the penalty of wiping out the $504.66 loan balance but, in view of the Debtors' failure to prove any other actual damages, justifies no further damages except allowance of reasonable attorney's fees to the Debtors' Counsel.

The Debtors and Plaintiffs in these adversarial proceedings are RHODA JUNG-KURTH, the mother of the other Debtor-Plaintiff, who filed her Chapter 13 bankruptcy Petition on November 19, 1986 (referred to hereinafter as "the Mother"); and JOYCE GRUBER, the Mother's daughter, who had previously filed her own Chapter 13 bankruptcy Petition on October 8, 1986 (referred to hereinafter as "the Daughter").

On January 8, 1987, the Debtors each filed separate adversarial proceedings against a company from which they made the loan in issue on February 22, 1985, EASTERN FINANCIAL SERVICES, INC. (hereinafter referred to as "the Lender"). Both averred that the loan was usurious and that the Lender had imposed prepayment penalties, in violation of 41 P.S. § 502 and 41 P.S. § 405, respectively, and the Daughter additionally sought treble damages, under 41 P.S. § 502, as a penalty for an alleged payment of usurious interest to the Lender. *Compare Russell, supra,* at 864, 869-870. In addition, both Debtors contended that the Lender engaged in practices violative of UDAP in the transactions

and in the Lender's subsequent series of collection practices.

A Summons was issued with each Complaint scheduling the trials on February 26, 1987. Answers to both Complaints were filed by the Lender on February 4, 1987. The Debtors engaged in discovery and, having not received full responses by the hearing date, filed a Motion to Compel Discovery. The Lender indicated that it would provide the documents requested forthwith, but the parties agreed that the trial could go forward, with the Debtors having the right to supplement the record with any relevant documents and, if necessary, to move to reopen the record on or before March 6, 1987. These developments prove what we suspect is frequently denied by other counsel despite its truth: if counsel prepares a case well and cooperates reasonably with opposing counsel, even hard-fought, difficult cases involving significant discovery can and will be tried rapidly in our Court, on the date originally listed for trial on the Summons.

At the close of the testimony, we issued an Order of February 27, 1987, incorporating the agreement set forth above regarding supplementation of the record, which we note resulted in the addition of a few documents and no request to reopen the proceedings, and reciting that, if no reopening was necessary, briefs were to be filed by the parties on March 19, 1987, and April 3, 1987, respectively.

After the parties submitted the briefing contemplated by this Order, the Debtors, on April 9, 1987, submitted an unsolicited Reply Memorandum. The Lender objected to this submission by letter, and we resolved this objection by allowing the Lender to file a Reply Brief, which it provided to us on April 24, 1987, and we note was quite substantial, approaching the length of its original Brief. This elicited two letters from the Debtors on April 27, 1987, and April 28, 1987, respectively, stating, in the first, that they believed, per Bankruptcy Rule 8009(a)(3), that they were entitled to file a Reply Brief and that this filing should have been the end of the briefing sequence; and, in the second, implicitly

contradicting their own previous position and submitting a substantive letter Reply Brief to the Lender's Reply Brief.

This sequence is noted because it brings to light the irritating habit of some counsel of submitting unsolicited Reply Briefs, often simply to serve the lawyer-like habit of needing to get the last word. Our view is that, when we, by order, create a briefing schedule, this establishes the entire briefing sequence, whether "ordinary" or not. We do not wish to stifle enlightenment by discouraging the filing of additional Briefs, but we also believe that it is only good manners to contact one's opponent if any change in the established schedule is requested, and thereafter communicate any proposed changes to the court for its approval or resolution of any disagreements. We do not countenance unilateral submission of materials additional to those ordered, as submission of the matter then becomes totally out of our control, and could conceivably result in an endless stream of counter-replies. Counsel who neglect to heed the procedure set forth herein may find themselves subjected to sanctions in the future.

While these cases present interesting and unusual legal issues, there are also certain important issues of fact which must be resolved before we apply the law, and therefore we are preparing our Opinion in the classic mode, per Bankruptcy Rule 7052 and Federal Rule of Civil Procedure 52(a), of setting forth separate Findings of Fact, Conclusions of Law, and then a Discussion.

## B. FINDINGS OF FACT

1. The Loan Agreement between the parties includes the following recitations:

AGREEMENT made this 22nd day of February, A.D. 1985, by and between EASTERN FINANCIAL SERVICES, INC. a Pennsylvania Corporation, hereinafter referred to as "Lender" and JOYCE GRUBER & JOSEPH F. SMOSNY t/a DOX'S LUNCH TRUCK, hereinafter referred to as "Borrower" and JOYCE GRUBER, hereinafter referred to as "Surety No. 1," and JOSEPH F. SMOSNY and ROSEMARY SMOSNY, his wife, hereinafter referred to as "Surety No. 2," and RHODA JUNG-KURTH, hereinafter referred to as "Surety No. 3," and also hereinafter referred to as "Surety/Sureties."

WITNESSETH:

WHEREAS "Lender" is about to make a business loan to "Borrower" in the amount of Fifteen Thousand Three Hundred Twenty dollars Eighty Eight cents ($15,320.88) and "Borrower" has agreed to pay back "Lender" the total sum of Twenty Three Thousand Five Hundred Ninety Four dollars Four cents ($23,-594.04) payable as follows:

1. In thirty six (36) monthly installments of Six Hundred Fifty Five dollars Thirty Nine cents ($655.39) each, commencing the 22nd day of March 1985, and each month thereafter until said loan is paid in full. . . .

. . . . .

3. "Borrower" shall have the privilege of prepayment at any time after the expiration of the first year of this contract by paying to "Lender" at the time of such prepayment, the total of the unpaid monthly installments, less a credit based on one half of the Rule of 78th Rebate Schedule.

4. "Borrower" agrees to pay all costs of Title Insurance, Notary fees, Recording Costs and Filing Fees.

5. "Surety/Sureties", individually, jointly and severally, hereby warrants and guarantees as "Surety/Sureties" the repayment of the aforesaid business loan, as more specifically set forth in Paragraph 1 and 2 hereof, to the "Lender" in the manner and on the dates above set forth.

6. As collateral for said business loan "Borrower" will give to "Lender" a Demand Note, in the amount of Twenty Three Thousand Five Hundred Ninety Four dollars Four cents ($23,594.04). A default in the payment of the aforesaid business loan, by the "Borrower," under the terms and conditions hereinafter set forth or breach of the terms of the aforesaid Loan Agreement shall be considered a default of this Note.

7. "Borrower" agrees, at time of settlement of said business loan, to pay to "Lender" the sum of Twelve Hundred ($1,200.00) dollars for Origination and Discount Fee and Three Hundred ($300.00) dollars for preparation of papers and settlement fee for this loan.

The Loan Agreement goes on to provide that the loan will be secured by a second mortgage against the residential real estate of the Daughter located at 1349 Sellers Street, Philadelphia, PA 19124; a first mortgage against the residential realty of Joseph and Rosemary Smosny located at 1344 Sellers Street, Philadelphia, PA 19124; a second mortgage against the residential real estate of the Mother at 1172 Passmore Street, Philadelphia, PA 19111; insurance on the three premises noted above, on which the Lender was named as loss payee; and insurance on the life of Joseph Smosny.

2. The Loan Agreement was entered into in order that the Daughter and Rosemary Smosny could purchase the business recited therein, Dox's Lunch Truck, from its prior owner, for whom the Daughter had worked as an employee for about a year and a half prior to the transaction.

3. The net proceeds which the borrowers obtained to purchase the lunch truck totalled only $12,070.00, despite the fact that the Loan Agreement recites that the principal loaned was $15,320.88.

4. Neither the Lender, nor any other party present at the loan closing, which included a "loan broker" who was identified phonetically as "Neil Poritsky," explained, either before or at the closing, the significance and contents of the components of the principal loaned of $15,320.88, and why the principal was in excess of $12,070.00, and none of the documents in the record of this case fully explain this. Further, we find that, per the Mother's testimony, that the papers executed were presented to the borrowers in such a way that only the signature line appeared and the complete document could not be easily read. The record establishes that $2,250.00 of the $3,150.88 difference between the $15,320.88 and $12,070.00 figures consisted of a $750.00 "commission" to the loan broker, $1,200.00 for an "Origination and Discount Fee," and $300.00 for preparation of the papers. We refuse to credit the testimony of George Yollin, the Lender's President, who stated, without elaboration, that "all was explained" to the Debtors by either him or the loan broker at settlement.

5. The Lender presented no evidence in the record regarding the distribution of the principal loaned. It also offered no rebuttal or apparent opposition, in either of its Briefs, to the Debtors' contention that the principal actually loaned to the Debtors was but $12,070.00.

6. Because we find that (1) The Lender failed to clearly explain the loan terms and charges imposed therein to the Debtors; (2) The difference consisted principally, and possibly solely, of charges which would be considered as "finance charges" under the federal Truth-in-Lending Act (hereinafter referred to as "TILA"), cf. 15 U.S.C. § 1605; (3) The Lender, although having the proof of same at its disposal, failed to identify the components of the loan proceeds on this record; and (4) Despite its multiple briefing, the Lender has not offered any rebuttal to the Debtors' assertion that the proceeds or principal amount of the loan was actually $12,070.00, we find that in fact the net amount borrowed, or the amount financed in the loan, was $12,070.00.

7. Therefore, the finance charges in the loan were actually the difference between $23,594.04 and $12,070.00, or $11,524.04. The annual percentage rate of the total finance charges in the loan was therefore 50.3 (50.3%) percent, per the TILA, cf. 15 U.S.C. § 1606, as the Debtors again assert, and the Lender does not attempt to rebut.

8. The Daughter, while intending to co-manage the business of Dox's Lunch Truck with Rosemary Smosny, did so, if at all, for a very short period of time, due to the vandalism and arson of the lunch truck and, subsequently, also to her home at 1349 Sellers Street, purportedly by Joseph Smosny or others acting in concert with him. She also executed an Affidavit at settle-

ment swearing that the loan proceeds would be used in this business.

9. Since she received little or no income from the business, the Daughter was unable to pay more than a total sum of $1,670.24 on the payments due on the loan between the date of Settlement and March 7, 1986.

10. In October, 1985, the home of the Daughter was destroyed by fire, due to the vandalism and arson referred to in Findings of Fact 8, and she thereafter made a claim to her fire insurer on the home.

11. When Mr. Yollin learned of this, he repeatedly contacted the Daughter and the Mother, with whom the Daughter was then living, to make certain that the Daughter would endorse the entire check proceeds over to the Lender towards the balance of the loan.

12. On March 7, 1986, Mr. Yollin came to the Mother's home and, upon assuring the Daughter that receipt of same would liquidate the entire loan balance and most likely result in a rebate of an unspecified sum to her, convinced the Daughter to endorse the entire check, in the net amount of $15,900.00, over to his company. Based upon these representations, the Daughter gave the entire check to Mr. Yollin to apply on the loan, which he did.

13. We acknowledge that Mr. Yollin testified to the contrary of certain contents of Findings of Fact 12, claiming that he told the Daughter, at this time, that the check proceeds would merely be applied to the loan and that the borrowers would be sent a statement of the balance due. However, we again refuse to credit the testimony of Mr. Yollin, due to his demeanor and manner of delivery of his testimony, which did not inspire confidence in his truthfulness. We also believe that, as the President of the Lender, Mr. Yollin certainly could have, and probably did, calculate the precise rebate which he claimed was due pursuant to paragraph three of the Loan Agreement prior to March 7, 1986, but he proceeded to conceal this fact from the Daughter in or-

der to get her full cooperation in remitting the $15,900.00 check to his company.

14. The following is our calculation of the rebate and net balance due on the loan after the payment of the $15,900.00 based upon our finding that the loan proceeds were $12,070.00, by three different methods:

a. Actuarial method (implicitly submitted to be the correct method by the Debtors in their Brief): Rebate: $5,519.14; Net Balance: $504.66.

b. Rule of 78's: Rebate: $4,775.58; Net Balance: $1,248.22.

c. One-half of Rule 78's (per paragraph three of the Loan Agreement): Rebate $2,387.79; Net Balance: $3,636.01.[1]

15. Shortly after receiving the $15,900.00 payment on March 7, 1986, Mr. Yollin began a pattern of contacting both the Daughter and the Mother on a regular basis by telephone for a sum which he then claimed was due, calling on approximately a weekly basis, and telling the Mother, on one occasion that "it is *your* house that I want."

16. Both the Daughter and the Mother are severely disabled, and this was known to Mr. Yollin. The Daughter receives Supplementary Social Security Income (hereinafter referred to as "SSI") disability benefits due to a severe ulcerated colitis and a psychiatric condition and the Mother is also disabled, being afflicted with a severe hypertension problem and being capable of ambulating only by use of a walker. Although the Debtors did not in any sense quantify their potential damages, Mr. Yollin's calls caused them severe emotional distress. We do not find credible in the least Mr. Yollin's claims that the Daughter and the Mother called him and harassed him. Certainly, they would have no motive to call him in the critical period, i.e., after March 7, 1986.

17. On September 11, 1986, the Lender filed a Complaint in Mortgage Foreclosure

---

1. We take judicial notice of the results of these calculations pursuant to Federal Rule of Evidence 201(b). *See Transorient Navigators Co.,* *S.A. v. M/S Southwind,* 788 F.2d 288, 293 (5th Cir.1986); and *Russell, supra,* at 860, 866 & n. 1.

against both Debtors and Mr. and Mrs. Smosny, seeking to foreclose on both the Smosny home and the Mother's home.

18. In that Complaint, the Lender itemized the damages due to it as follows:

| | |
|---|---|
| Original amount of mortgage | $23,594.04 |
| Paid on account | 16,390.52 |
| Balance | $ 7,203.52 |
| Late Charges | 688.17 |
| Searches and costs of suit | 300.00 |
| Attorney's fees | 1,179.70 |
| Balance | $ 9,371.39 |
| Less Interest Rebate | 1,900.34 |
| REAL DEBT | $ 7,471.05 |

It is not clear how any of the figures except the "Original amount of mortgage" have been calculated, and the amount "Paid on account" is inexplicably $1,178.72 less than Mr. Yollin had recited in a letter to the Pennsylvania Bureau of Consumer Protection on May 14, 1986, in response to the Daughter's complaints about the Lender to that agency. The "interest rebate" allowed is even less than the contract appears to allow. See Finding of Fact 14c *supra*. We accept the figure stated in the May 14, 1986, letter as the more credible, and we note that these discrepancies also reflect adversely on Mr. Yollin's credibility.

## C. CONCLUSIONS OF LAW

1. The Loan Agreement was a "business loan," within the definition of that term in Act 6, 41 P.S. § 301(f)(v), and its pertinent Regulations, 10 PA.CODE § 7.2 (Definition of "Business loans").

2. Therefore, the interest rate charged in the loan transaction, although at a very high annual percentage rate of 50.3 percent, was not violative of any interest rate limitations in Act 6, since none were applicable.

3. Although the loan may have not been a "business loan" as to her, the Mother's status as a surety on the loan renders her liability thereon co-extensive with that of the Daughter, and hence the loan was not violative of the interest rate limitations in Act 6 as to her, either.

4. Nevertheless, the loan was subject to other applicable provisions of Act 6, including 41 P.S. § 405, which prohibits imposition of any penalties for repayment.

5. A failure to provide a rebate to borrowers less than that which results from a calculation performed pursuant to the "actuarial method" constitutes a prepayment penalty.

6. The provisions of 41 P.S. § 405 may not be waived, and hence the provisions of the Loan Agreement regarding prepayment to the contrary are unenforceable. 41 P.S. § 408.

7. The computation of the rebate pursuant to the actuarial method results in the determination that the net balance due on the Loan Agreement, as of March 7, 1986, was $504.66.

8. Pennsylvania UDAP applies to business loan transactions.

9. Although the Lender engaged in several unfair and deceptive practices in violation of UDAP, the only damages proven were the Lender's attempts to collect a balance due which it had earlier misrepresented would be liquidated in full at the time of the $15,900.00 payment.

10. Therefore, the only damages which we will award to the Debtors, either pursuant to 73 P.S. § 201–9.2 of UDAP, or, assuming *arguendo* that § 201–9.2 is not applicable, in the nature of recoupment, is elimination of the remaining loan balance as to both Debtors.

11. The claims of the Lender against the Debtors are declared null and void, but no sums shall be awarded to the Debtors from the Lender, except that the Debtors' counsel may recover reasonable attorney's fees pursuant to at least 41 P.S. § 503.

## D. DISCUSSION

1. ALTHOUGH ACT 6 DOES APPLY GENERALLY TO THIS TRANSACTION, THE LOAN IN ISSUE IS A "BUSINESS LOAN" NOT SUBJECT TO THE INTEREST RATE LIMITATIONS OF ACT 6

Act 6 applies, generally, to transactions involving "residential mortgage" obligations, i.e., credit transactions in which a lender takes a security interest against the

residence of an obligor in the contract. Act 6 itself defines a "residential mortgage" as follows, in 41 P.S. § 101:

§ 101. Definitions

As used in this act:

"Residential mortgage" means an obligation to pay a sum of money in an original bona fide principal amount of fifty thousand dollars ($50,000) or less, evidenced by a security document and secured by a lien upon real property located within this Commonwealth containing two or fewer residential units or on which two or fewer residential units are to be constructed and shall include such an obligation on a residential condominium unit.

The pertinent portion of the Regulations defining the term "residential mortgage" appear at 10 PA.CODE § 7.2, as follows:

§ 7.2. Definitions and rules of construction.

Unless the context indicates otherwise, the following definitions and rules of construction apply:

. . . . .

*Residential mortgage*—Shall mean the following:

(i) *Residential mortgage*—For purposes of the permissible interest rate under the act but not the disclosure requirements under the act, shall be deemed not to include any transaction which is entered into pursuant to an act within the scope of section 604 of the act (41 P.S. § 604).

(ii) *Residential mortgage*—For purposes of sections 403 and 404 of the act (41 P.S. §§ 403, 404), shall include any obligation to pay a sum of money in an original *bona fide* principal amount of $50,000 or less, evidenced by a security document as defined in the act and this chapter, and secured by a lien upon real property located within this Commonwealth containing two or fewer resi-

dential units or on which two or fewer residential units are to be constructed and shall include such an obligation on a residential condominium unit.

. . . . .

We can conceive of no reason why the Loan Agreement in question would not be properly characterized as a "residential mortgage" obligation under these definitions, especially since that term has been broadly construed by the Pennsylvania courts. *See Anderson Contracting Co. v. Daugherty,* 274 Pa.Super. 13, 417 A.2d 1227 (1979).[2]

However, the Act 6 provision relating to maximum permissible interest rates is further limited in scope by the following provision, appearing at 41 P.S. § 301(f)(v):

(f) The maximum lawful rate of interest set forth in this section and in Article II of this act shall not apply to ... (v) business loans the principal amount of which is in excess of ten thousand dollars ($10,000).

The Regulations at 10 PA.CODE § 7.2, thusly define the term "Business loans:"

Unless the context indicates otherwise, the following definitions and rules of construction apply:

. . . . .

Business loans—For the purposes of the act shall mean extensions of credit where the funds are to be utilized in a business enterprise and where the following conditions exist:

(i) The borrower exercises actual control over the managerial decisions of the enterprise in which the funds are to be utilized.

(ii) The borrower signs an affidavit under penalty of perjury setting forth the intended use of proceeds.

The "business loan" definition in Act 6 and the Regulations have not been con-

---

**2.** The 1978 amendment to Act 6 alluded to in *Anderson,* 274 Pa.Super. at 18 n. 2, 417 A.2d at 1229 n. 2, which limited the definition to loans to purchase, improve, or repair real property, was subsequently repealed by Section 2 of the act of April 6, 1979, P.L. 15, No. 4. The reference to a former provision of the Pennsylvania

Code, including the limitation codified in the 1978 amendment, referred to in *First Mortgage Co. v. Carbone,* 3 Pa.D. & C.3d 517, 523 (Pike Co.C.P.1977), relied upon by the Lender, has been deleted from the Code upon the repealer of the 1978 amendment and therefore reliance on that case by the Lender is misplaced.

strued very frequently. The only cases cited by the parties and which we could locate which do so are *In re Schlag*, 60 B.R. 749, 750–51 (Bankr.W.D.Pa.1986), wherein it was held that a lender meets its burden that the interest rate limitations of Act 6 are inapplicable as long as one of the alternative sets of facts set forth in 41 P.S. § 301(f) are met, and *East Coast Management, Inc. v. McLaughlin*, 533 F.Supp. 439, 441–42 (E.D.Pa.1982), wherein present Court of Appeals Judge Edward R. Becker, when sitting as a district judge, held that a note given by a partner who was ousted from management to the lender-partner was not a "business loan," because it failed to satisfy either prong of the "business loan" definition appearing in 10 PA.CODE § 7.2.

The Debtors strive to analogize this transaction to that in *East Coast* by pointing out that the Daughter, if she "managed" Dox's Lunch Truck at all, did so for only the very brief time until the truck was destroyed. However, the analogy fails because the definition merely states that it is required that the loan proceeds "are *to be utilized*" in a transaction where the borrower was to exercise managerial control in the enterprise. We agree with the Debtors that, if the transaction were known by the Lender to be a sham simply to avoid the state usury laws, like that in *Greene v. Gibraltar Mortgage Investment Corp.*, 488 F.Supp. 177 (D.D.C. 1980), we would not apply § 301(f)(v). Here, however, while we do find overreaching on the part of the Lender in several aspects of the transaction, we fail to find any degree of wrongdoing in its casting the transaction as a "business loan." It *was* intended, by all parties, to be a business loan. There was no conduct on the part of the Lender here, as appears to have been the case in *East Coast*, which frustrated the purpose that the Daughter would co-manage Dox's Lunch Truck; it was frustrated by the destruction of the truck, pur-

portedly by Joseph Smosny. Also, contrary to the *East Coast* loan situation, the Daughter executed, in good faith, the requisite affidavit that she intended to use the proceeds for a business purpose.[3]

Therefore, whatever moral judgment might be made about lending money at an effective annual percentage rate of 50.3 percent, we must conclude, on authority of 41 P.S. § 301(f)(v), that doing so in this business transaction was not violative of Act 6 or any other Pennsylvania law. However, since the Mother suggests that this loan should not be considered as a business loan as to her even if it is considered as such as to the Daughter, we must address the characterization of the loan separately as to the Mother.

### 2. AS THE MOTHER WAS A SURETY ON THE LOAN, SHE IS PRIMARILY LIABLE ON THE SAME UNDERTAKING AS THE DAUGHTER-PRINCIPAL, AND HENCE THE TRANSACTION IS ALSO A "BUSINESS LOAN" AS TO HER

There is no question that the Mother signed the loan as a "surety." It is well established that "a surety, as well as his principal, is primarily liable upon the original undertaking upon default. *Plummer v. Wilson*, 322 Pa. 118, 185 A. 311 (1936)." *General Electric Credit Corp. v. Tarr*, 457 F.Supp. 935, 938 (W.D.Pa.1978). *See also, e.g., Keystone Bank v. Flooring Specialists, Inc.*, 513 Pa. 103, 518 A.2d 1179, 1184 (1986); *Commonwealth v. Great American Indemnity Co.*, 312 Pa. 183, 199, 167 A. 793, 799–800 (1933); *First Mortgage Co. of Pennsylvania v. McCall*, 313 Pa.Super. 54, 58–59, 459 A.2d 406, 408 (1983); and 74 AM.JUR.2d 12, 28 (1974).

We agree with the Debtors' assertion that, simply because a borrower enters into a transaction in which the ultimate purpose involves a business, does not necessarily render a transaction a "business loan" as to that borrower. *Cf. Burroughs v. Asso-*

---

**3.** The Lender submitted, as an exhibit to its Reply Brief, a similar Affidavit executed by the Mother. Despite the Lender's "inadvertence" in failing to do so, and its apology to the Court, this document cannot be considered as part of

the record. *Compare Russell, supra*, at 868–869. However, since we hold the Mother liable equally with the Daughter due to her role as a surety in the transaction, this evidentiary gap is not relevant to the outcome.

*ciates Financial Services Co.,* No. C–C–76–04 (W.D.N.C., Memo. of Decision filed July 30, 1976) (loan of which only a small portion was used for business held a "consumer transaction" for purposes of TILA); and *Allen v. City Dodge, Inc.,* C.A. No. C74–427A (N.D.Ga., Recommendation of Bankruptcy Judge Drake filed Sept. 8, 1975) (loan to purchase a truck for friend's business held a "consumer transaction" as to borrower for purposes of TILA).

However, here, there are two practical reasons why, irrespective of the fact that the Mother's status as a surety would render her liable co-extensively with her Daughter-principal, the Mother's claim that the transaction should not be considered a "business loan" as to her must be rejected. First, although we believe that the Lender did not fully disclose the terms of the transaction to any of the borrowers and that the Mother was kept in the dark to a greater degree than the Daughter,[4] we believe that the Mother certainly knew that the loan was in fact a business loan and that she was rendering herself liable on it. Secondly, it is difficult to fathom how a loan could be written which applies one interest rate to principal obligors in a transaction and another interest rate to others. This was not the case in *Burroughs, supra,* or *Allen, supra,* where the issue presented was whether the entire loan was a "consumer transaction." We would be hard-pressed to find, and have found no authority for, a holding that a transaction is a business loan as to one obligor and a consumer loan as to another.

We therefore reject the claims of both Debtors that the transaction in issue was violative of 41 P.S. § 502, and hence usurious.

### 3. THE LOAN IN ISSUE IS SUBJECT TO THE PROHIBITION OF PRE-PAYMENT PENALTIES SET FORTH IN ACT 6

■ Our earlier discussion of Act 6, at pages 329–330 *supra,* establishes that,

although the transaction in issue may be exempt from the interest rate limitation of Act 6 by operation of 41 P.S. § 301(f)(v), the transaction is nevertheless subject to Act 6 generally. Therefore, the following provision of Act 6, 41 P.S. § 405, prohibiting imposition of pre-payment penalties, is applicable:

§ 405. Prepayment penalty prohibited

Residential mortgage obligations contracted for on or after the effective date of this act may be prepaid without any penalty or other charge for such prepayment at any time before the end of the period of the loan.

Act 6 further establishes that this protection may not be waived by "oral or written agreement," or by contract. 41 P.S. § 408. The issue which confronts us in interpreting this provision is: what method of computing the rebate of the total pre-paid finance charge of $11,524.04 to which the Debtors were due upon the lump-sum prepayment of $15,900.00 on March 7, 1986, insures that no "penalty or other charge" will be imposed upon the Debtors? Unfortunately, neither party addresses this issue, although the Debtors, without explaining their methodology, implicitly argue that the rebate should be calculated pursuant to the actuarial method by utilizing this method in its calculations. The Lender, in both of its Briefs, never touches upon the issue and offers no calculations or arguments addressing it.

### 4. THE DEBTORS' REBATE MUST BE CALCULATED PURSUANT TO THE ACTUARIAL METHOD TO PREVENT THE IMPOSITION OF A PENALTY UPON THE DEBTORS

■ We have no hesitancy in concluding that denying a borrower a rebate of unearned finance charges is contrary to any sense of fair play and contrary to Pennsylvania's laws and public policy, would be a violation of the Act 6 prohibition on prepayment penalties. The instant factual setting graphically illustrates the problem. The

---

**4.** For instance, the testimony revealed that the Daughter was apparently aware, at the time of Settlement, that the $750.00 commission was being paid to the "loan broker," and the Mother, at the time of Settlement, was not.

Debtors were to pay a finance charge of $11,524.04, an annual percentage rate in excess of 50 percent, on a loan the proceeds of which were $12,070.00, merely because they were given thirty-six (36) months to pay it off. As it developed, the fire insurance recovery on the Daughter's home, although leaving the Daughter with no home, did leave her with a $15,900.00 lump sum which she paid to the Lender in the (13th) month of the loan. The Lender's money was, for the most part, out of its use for only about one-third of the term of the Loan Agreement. Surely, it makes sense that the Debtors should receive some credit or rebate of the $12,524.04 finance charge which they contracted to pay on the condition that the loan would run its stated course.

This self-evident principle is articulated by such cases as *In re Sprouse*, 577 F.2d 989, 990–91 (5th Cir.1978); *Circle v. Jim Walter Homes, Inc.*, 470 F.Supp. 39, 42 (W.D.Okla.1979), *aff'd*, 654 F.2d 688 (10th Cir.1981); *Aetna Fin. Co. v. Brown*, 172 Ga.App. 537, 323 S.E.2d 720, 722 (1984); *Hardy v. G.A.C. Finance Corp.*, 131 Ga. App. 282, 205 S.E.2d 526 (1974), *aff'd*, 232 Ga. 632, 208 S.E.2d 453 (1974); *Union Trust v. Tyndall*, 290 Md. 102, 428 A.2d 428, 432–33 (1981); *Jackson Investment Co. v. Bates*, 366 So.2d 225, 228–31 (Miss. 1978); *Jim Walter Homes, Inc. v. Shuenemann*, 668 S.W.2d 324, 328–33 (Tex.1984); *Dryden v. City Nat'l Bank of Laredo*, 666 S.W.2d 213, 220–21 (Tex.Civ.App.1984); and *General Motors Acceptance Corp. v. Uresti*, 553 S.W.2d 660, 663 (Tex.Civ.App. 1977), where failure of the respective creditors to rebate unearned finance charges to the respective debtors were determined to be usurious acts. The same concept has been recognized in several cases construing Pennsylvania law, but this issue has not, to our knowledge, been litigated in this state, probably because most of the laws of this state expressly require that rebates of unearned finance charges be given to consumers who pre-pay according to a certain statutorily-designated formula. *See Johnson v. McCrackin-Sturman Ford, Inc.*, 527 F.2d 257, 264–65 (3d Cir.1975) (windfall to creditor avoided by provision of Pennsylva-

nia Motor Vehicle Sales Finance Act, 69 P.S. § 622, requiring a rebate of finance charges upon acceleration); and *Perry v. Liberty Consumer Discount Co.*, 433 F.Supp. 1352, 1357–58 (E.D.Pa.1977), *aff'd*, 577 F.2d 728 (3d Cir.1978) (prepayment penalty violative of TILA would be imposed but for state loan act provisions requiring rebates of unearned finance charges). *Cf. Haas v. Pittsburgh National Bank*, 526 F.2d 1083, 1091–95 (3d Cir.1975) (compounding of interest and use of "previous balance" method of computing credit card finance charges held contrary to Pennsylvania law); and *Acker v. Provident National Bank*, 512 F.2d 729, 739–42 (3d Cir. 1975) (imposing interest upon interest in credit card transactions held violative of Pennsylvania law).

It is therefore clear to us that failing to provide a fair rebate of unearned finance charges would constitute a prepayment penalty, which is prohibited in any form by 41 P.S. § 405. The question remains as to what formula should be used to calculate a "fair" rebate.

We have located a relatively small body of law which discusses and analyzes the two widely-used methods for calculating rebates of unearned finance charges, the "Rule of 78's" and the actuarial method. *Ford v. Termplan, Inc. of Georgia*, 528 F.Supp. 1016 (N.D.Ga.1981); *Ballew v. Associates Financial Services Co.*, 450 F.Supp. 253, 257–63 (D.Neb.1976); and *Scott v. Liberty Finance Co.*, 380 F.Supp. 475 (D.Neb.1974). *See also, Burley v. Bastrop Loan Co.*, 407 F.Supp. 773, 781 (W.D. La.1976), *rev'd on other grounds*, 590 F.2d 160 (5th Cir.1979); *Johnson v. Associates Finance, Inc.*, 369 F.Supp. 1121, 1123 (S.D. Ill.1974); *Kenney v. Landis Financial Group, Inc.*, 349 F.Supp. 939, 946 (N.D. Iowa 1972). We also note a very comprehensive law review article on this topic, J. Hunt, *The Rule of 78: Hidden Penalty for Prepayment in Consumer Credit Transactions*, 55 BOSTON U.L.REV. 331 (1975).

 Review of these authorities, all of which are consistent in their conclusions, convinces us that the actuarial method is undoubtedly the correct method of comput-

ing rebates of finance charges and the Rule of 78's has been employed only because of its purported ease of calculating results according to it and the erroneous assumption of some courts and, apparently, some state legislatures as well, that it will, in all situations, yield a result very close to that attained by the actuarial method, the latter of which is agreed to be the accurate method. Although we recognize that some Pennsylvania laws regulating financing transactions expressly authorize the use of the Rule of 78's, *e.g.*, 7 P.S. § 309(g) (Banking Code); 7 P.S. § 6214 D (Consumer Discount Company Act); 73 P.S. § 500–303(b) (Home Improvement Finance Act), we note that this application is not uniform. 69 P.S. § 1603 (Goods and Services Installment Sales Act amended in 1982 to require use of actuarial method).

In any event, we cannot justify the use of the Rule of 78's in a context where the legislature has not expressly authorized its use, as it is incontrovertable that the Rule is an inaccurate measure of the actual rebate to the detriment of borrowers. We hold that its use here would constitute a prepayment penalty, in violation of 41 P.S. § 405. The Lender's unconscionable attempt to limit the Debtors' rebate to *half* of the figure which the Rule of 78's would already deflate, by contract, is therefore a bare-faced violation of 41 P.S. § 405, which 41 P.S. § 408 renders totally ineffective.

We also note that the calculations reflected in Finding of Fact 14, page 328 *supra,* bear out the mathematically-supported observation in the Hunt article, 55 BOSTON U.L.REV. at 340–41, that the inaccuracy of the Rule of 78's becomes more pronounced when the finance charges are "graduated." Here, where the annual percentage rate is "graduated" to over 50 percent, the inaccuracy in the application of the Rule of 78's, as opposed to the actuarial method, would result in a bonus of $743.56 to the Lender, more than doubling the $504.66 that would have been due after the

March 7, 1986, lump sum payment of $15,-900.00 if the rebate were calculated pursuant to the actuarial method. This mathematical differentiation totally rebuts the casual, undocumented, and erroneous assertion by such courts as that in *Bone v. Hibernia Bank,* 493 F.2d 135, 140 (9th Cir.1974), that "there is a *slight* difference in the amount of the rebate under the Rule of 78's from that of the actuarial method" (emphasis added).[5]

We therefore hold that 41 P.S. § 405 requires that rebates of unearned finance charges must be computed by the actuarial method in order to avoid imposition of a penalty for prepayment. Applying this holding here, we conclude that, after the $15,900.00 remittance on March 7, 1986, the Debtors owed but $504.66 to the Lender, the balance due after the rebate calculated by us to be due pursuant to the actuarial method.

### 5. UDAP APPLIES TO BUSINESS LOANS

We have already discussed the scope of UDAP at length in *Russell, supra,* at 871–872, and reiterate the conclusion articulated there that UDAP is to be liberally and broadly construed to cover all transactions which are not expressly or logically excluded from its scope. We reiterate the conclusion in *Russell* that it extends to loan transactions, at 872, and our statement, in passing, that, following *Commonwealth v. Tolleson,* 14 Pa.Cmwlth. 72, 122–24, 321 A.2d 664, 692–93 (1974), its scope has been and should be extended to business transactions as well. *Id.* at 871. *See also Commonwealth v. Koskat Interplanetary, Inc.,* 54 ERIE Co.L.J. 79, 92–94 (Erie Co.C. P.1971). *Cf. Windsor Distributing Co. v. Federal Trade Comm'n,* 437 F.2d 443 (3d Cir.1971) (federal FTC Act applied to business transaction). We acknowledge that, in *Zerpol Corp. v. DMP Corp.,* 561 F.Supp. 404, 415 (E.D.Pa.1983); and *Permagrain Products v. U.S. Mat & Rubber Co.,* 489

---

**5.** We note that the issue in *Bone,* as in all of the cases cited at page 333 *supra,* was whether a contract which made reference to the "Rule of 78's" accurately disclosed "late charges," as required by the TILA. This disclosure issue is distinct from the issue here, *i.e.,* what method of calculation is required under the applicable state law. Neither *Bone,* nor any of the other cases, support the conclusion that the Rule of 78's should be preferred in such a context.

F.Supp. 108, 111 (E.D.Pa.1980), the late former Chief Judge Alfred L. Luongo of our local district court, held, in dictum, that the language of 73 P.S. § 201–9.2(a) confined damages under that section to "any person who purchases or leases goods or services principally for personal, family or household purposes," i.e., not parties to business transactions. We note that Judge Luongo's reference is *only* to the provision concerning maintenance of private actions, 73 P.S. § 201–9.2(a). No such limiting language appears in those provisions relevant to the scope of UDAP generally. *See* 73 P.S. §§ 201–2(2), (3), (4), 201–3.

We therefore hold that UDAP applies to this transaction, and we will determine whether the Lender here has engaged in deceptive practices in violation of UDAP and whether any penalty can be imposed here apart from 73 P.S. § 201–9.2(a).

6. THE INSTANT TRANSACTION IS PERVADED WITH OVERREACHING BY THE LENDER AND THIS COURT WILL THEREFORE BAR THE LENDER FROM MAKING ANY FURTHER CLAIMS AGAINST THE DEBTORS

Considering not only the "cold facts" of the writing of the loan transaction in a manner which permitted it to charge an exorbitant rate of interest and attempted to include an illegal contract clause purporting to limit the Debtors' right to a substantial rebate of finance charges in violation of 41 P.S. §§ 405, 408, the Court's observation of the demeanor of the witnesses convinces us that this transaction was pervaded by overreaching on the part of the Lender. Mr. Yollin presented to us almost a Dickensonian (or Shakespearean) picture of a "moneylender." His replies to relevant inquiries were unconvincing total denials of all potential wrongdoing on the part of him and his company, without elaboration. While we found the Daughter unreliable in relating some particulars of the transactions due to her emotional instability, we found Mr. Yollin purposefully deceptive and not credible in the least. Of the three witnesses, the Mother impressed us as the most reliable.

We believe that Mr. Yollin, as President of the Lender, wrote this transaction with every possible advantage to his company in mind. We believe that he siphoned off over $2,000.00 to various commissions and fees, took an unconscionable amount of security, charged an unconscionably high interest rate, purported to collect an illegal prepayment penalty, and, most importantly, attempted to conceal these provisions in the contract from the borrowers, who were obviously unsophisticated and unrepresented by anyone except a mysterious loan broker working, as far as we can tell, hand-in-glove with the Lender. We must conclude that the Lender engaged in gross "fraudulent conduct" which was intended to and in fact did create "confusion and misunderstanding," 73 P.S. § 201–4 (xvii), on the part of the Debtors, in the writing of this transaction.

Moreover, we believe that the Lender, per Mr. Yollin, engaged in a separate and very significant violation of 73 P.S. § 201–4 (xvii) by misrepresenting to the Daughter that the payment of the $15,900.00 lumpsum on March 7, 1986, would wipe out the entire loan balance due, as an inducement to the Daughter to hand over this entire sum to him. Given the hardship suffered by the Daughter in her loss of her business and her home, and the fortuity that the Lender was able to collect what it did, we cannot condone the morality, let alone the legality, of Mr. Yollin's subsequent pursuit of the Mother to squeeze more money out of her or threaten, perhaps, unfortunately, truthfully, that his company would take *her* home if she failed to make additional payments.

We also believe that the Lender, again per Mr. Yollin, violated several of the Debt Collection Trade Practices Regulations promulgated by the Pennsylvania Department of Justice, Bureau of Consumer Protection, in his pursuit of, particularly, the Mother, most notably 37 PA.CODE §§ 303.-3(3), (14) (falsely representing status of debt in demanding far greater than $504.66 after March 7, 1986); 303.4(2) (contacting

the Debtors more than once within a seven-day period); and 303.3(27) (threatening to take the invalid Mother's home if she did not pay). Clearly, any violations of these Regulations, promulgated pursuant to 73 P.S. § 201–3.1 of UDAP, are violations of UDAP *per se.*

For two reasons, however, we do not find ourselves able, on this record, to impose any penalty upon the Lender for its gross and repeated violations of UDAP other than wiping out the modest remaining loan balance. The first is our concern, with Judge Luongo, as to whether 73 P.S. § 201–9.2(a) allows an affirmative damage award in a non-consumer transaction.

■ The second is that a recovery under § 201–9.2(a) is expressly limited to "actual damages." We believe that the analysis of "actual damages" under § 201–9.2(a) should be the same as that which we employed in interpreting 15 U.S.C. § 1640(a)(1) of the TILA in *Russell, supra,* at 863–64. Thus, a deceptive act should be penalized by a liberal measure of the reasonable consequences of the act to the wronged party.

The difficulty here is that the Debtors have given us no proof in the record and not even an argument anywhere in their three submissions to us which suggests how we can measure even the reasonable consequences of the Lender's unfair trade practices, except insofar as we can conclude that, had the Lender not misrepresented to the Daughter that the $15,900.00 remittance would pay off the loan, she may well not have cooperated in giving it to him. Also, this element of damage is more in the nature of recoupment than in the nature of an affirmative award in favor of the wronged party, as is contemplated by § 201–9.2(a). *Compare In re Hanna,* 31 B.R. 424 (Bankr.E.D.Pa.1983); and *Household Consumer Discount Co. v. Vespaziani,* 490 Pa. 190, 415 A.2d 689 (1980). Therefore, such relief can be granted to the Debtors even if we follow Judge Luongo's holdings in *Zerpol* and *Permagrain.*

## 7. CONCLUSION

We shall therefore enter an Order striking the Lender's claims against the Debt-ors in their entirety as our sole award of relief to them. In addition, 41 P.S. § 503 contemplates that the Debtors' counsel may receive reasonable attorney's fees for success in any "action arising under this act," which would certainly appear to include the violation of 41 P.S. § 405 which we find to have occurred here. We also believe that 73 P.S. § 201–9.2(a), which allows "additional relief as [the court] deems necessary or proper," would justify such fees, assuming *arguendo* that § 201–9.2(a) is applicable to this action.