**In re Barbara Jo SALER, Debtor.**

**Barbara Jo SALER, Plaintiff,**

**v.**

**Arnold HURVITZ and Elaine Hurvitz, Oscar H. Krug and Rhoda S. Krug, Defendants.**

Bankruptcy No. 87–05381S.
Adv. No. 87–1024S.

United States Bankruptcy Court,
E.D. Pennsylvania.

March 30, 1988.

---

Morton R. Branzburg, Philadelphia, Pa., for defendants.

David A. Koss, Philadelphia, Pa., for debtor.

## MEMORANDUM OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

We are herein presented with Cross-motions for summary judgment in an adversary proceeding arising out of an individual Chapter 11 case.[1] The issues presented are (1) Whether the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201–1, et seq. (referred to herein by its generic designation as a law prohibiting unfair or deceptive acts and practices or "UDAP") applies to business transactions; and (2) If it does, whether an appraiser's visit to the obligors' home, on which a mortgage was taken, brings the transaction within the scope of 73 P.S. § 201–7 of UDAP, which regulates, for want of a better shortcut designation, "door-to-door" sales. We hold that the transaction is within the scope of UDAP, but is not within the scope of 73 P.S. § 201–7. We therefore shall grant the Defendant's motion for summary judgment, and dismiss the Debtor's Complaint.

The underlying Chapter 11 case was filed on October 27, 1987, the day before a sheriff's sale of the Debtor's premises was scheduled to execute on a mortgage foreclosure judgment in the amount of about $100,000.00 obtained by Atlantic Financial Federal (hereinafter referred to as "AFF"), the first mortgagee on the Debtor's premises located at 1020 Indian Creek Road, Wynnewood, Montgomery County, Pennsylvania (hereinafter referred to as "the Premises"). On November 4, 1987, the Defendants in this proceeding, Arnold Hurvitz, Elaine Hurvitz, Oscar H. Krug, and Rhoda S. Krug (hereinafter "the Defendants"), filed a Motion seeking relief from the automatic stay under 11 U.S.C. § 362(d) to execute upon their second mortgage in the alleged amount of $570,600.90. AFF joined the Defendants in this motion.

The Debtor was the sole owner of the Premises by deed from her estranged husband, Richard T. Saler, of his interest in same. On November 5, 1987, she signed an Agreement to sell the Premises to third parties for $775,000.00. This sum was apparently sufficient to cover both mortgages, taxes, realty commissions, and at least a third mortgage held by ESP Financial Services, Inc. The Defendants and AFF, upon learning of this Agreement of Sale, agreed that the motion was moot.

---

1. We note that, in *In re McStay*, 82 B.R. 763, 765–767 (Bankr.E.D.Pa.1988), Judge Fox of this court recently held that individual, non-business filings are permissible under Chapter 11. We concur with this conclusion, although we believe that the high filing fee ($500.00) and quarterly fee ($150.00) will discourage most such filings, 28 U.S.C. § 1930(a)(6), unless, like here, the Debtor is a consumer whose obligations are clearly beyond the statutory limits of Chapter 13. See 11 U.S.C. § 109(e).

The only dispute remaining to be resolved was how the sale proceeds would be distributed. On December 3, 1987, the Debtor commenced an adversary proceeding, Adv. No. 87–0996S, for permission to sell the Premises free and clear of the liens and to distribute the proceeds according to the attachment of the parties' relative lien priorities. On December 23, 1987, we entered an Order allowing the sale, but postponing a trial on the issue of distribution until a later date, now established as April 5, 1988.

On December 16, 1987, the Debtor initiated the instant Complaint, focusing on the particular claim of the Defendants. The Complaint was in two Counts, both claiming violations of law and seeking damages in the nature of recoupment or setoff arising from the loan transaction between the Debtor and her husband and the Defendants on July 1, 1986, which gave rise to the second mortgage. The first Count was based on the federal Truth-in-Lending Act, 15 U.S.C. § 1601, et seq. (hereinafter referred to as "TILA"); the second was based on UDAP. The factual basis of both Counts were claims of excessive charges of fees, most prominent of which were "placement fees" of $44,700.00. The relief prayed for in both Counts was rescission of the loan contract, the principal sum of which was $450,000.00 and on which the interest rate was seventeen (17%) percent.

Through depositions of the Debtor and her husband, it was established that the loan proceeds were largely utilized to finance the husband's business ventures. It was also established that the loan in question was made through a loan broker and settled at a title company office. However, prior to making the loan, the Defendants had the home appraised. The appraiser visited the Debtor's home to perform this service, apparently at a time when the Debtor was not at home and at which time the Debtor's husband merely greeted the appraiser and then departed.

On February 8, 1988, we approved a Stipulation dismissing the TILA Count.[2] On February 26, 1988, the Defendants filed a Motion for Summary Judgment as to the remaining UDAP Count. Perceiving that a delay in disposition of this Motion, scheduled for a hearing on March 29, 1988, could delay the trial, scheduled with the trial on Adv. No. 87–0966S on April 5, 1988, we entered an Order of March 2, 1988, requiring the Debtor to respond to this motion by March 21, 1988, and providing the Defendants an opportunity to counter-reply by March 25, 1988. We also noted in our Order the existence of our possibly pertinent decision in *In re Jungkurth*, 74 B.R. 323, 334–36 (Bankr.E.D.Pa.1987). The Debtor responded with a cross-motion for summary judgment in her favor addressing only the § 201–7 claim. As the Defendants contended in their Reply Brief and the Debtor's counsel expressly indicated to us at argument on March 29, 1988, the Debtor's UDAP Count was limited strictly to a contention that § 201–7 applied. Any claims based upon 73 P.S. §§ 201–3 and 201–2 of UDAP were abandoned, probably because the Debtor could not prove her lack of awareness of the inclusion of the fees in issue or establish fraud on the part of the Defendants or their agents.

We believe that our previous decisions interpreting UDAP, most notably *In re Andrews*, 78 B.R. 78 (Bankr.E.D.Pa. 1987); *Jungkurth, supra;* and *In re Russell*, 72 B.R. 855, 870–72 (Bankr.E.D.Pa. 1987), establish that the instant transaction was generally within the scope of UDAP. In *Jungkurth*, we held that the debtor-plaintiff had entered into a "business loan," even under a very narrow definition of this term set forth in 41 P.S. § 301(f)(v) and 10 PA.CODE § 7.2. 74 B.R. at 329–31.

---

2. Apparently, the Debtor was not prepared to argue that the transaction in issue was not "primarily for business," within the scope of 15 U.S.C. § 1603(1) of the TILA, or that the Defendants are "creditors," within the scope of 15 U.S. C. § 1602(f). Therefore, we do not have the task of construing the Pennsylvania Supreme Court's recent dicta in *First Nat'l Bank v. Flana-* *gan*, 515 Pa. 263, 528 A.2d 134, 135 (1987), that 41 P.S. § 401 provides a requirement that TILA disclosures are required in this state "in all cases where residential real estate was affected, without regard to the loan's purpose." *But see* Pennsylvania Department of Banking, Statement of Policy, 18 PA.BULL. 778–79 (Feb. 20, 1988).

Nevertheless, we held that UDAP applied to the transaction because "its scope has been and should be extended to business loans." *Id.* at 334. We found clear support for this holding in not only our own dicta in *Russell*, 72 B.R. at 872, but in *Commonwealth v. Tolleson*, 14 Pa. Cmwlth. 72, 122–24, 321 A.2d 664, 692–93 (1974); and *Commonwealth v. Koskot Interplanetary, Inc.*, 54 ERIE CO. L.J. 79, 92–94 (Erie Co. C.P.1971).

In *Jungkurth*, we also addressed the apparent limitation in the scope of 73 P.S. § 201–9.2 of UDAP, which provides a private right of action to only persons who purchase or lease goods "for personal, family or household purposes." *Id.* at 334–35. However, we pointed out that the use of UDAP by a bankruptcy debtor to assert what was in substance a recoupment against the claim of a creditor arising out of a business transaction was nevertheless permissible. *Id.* at 336. *See, e.g., Rothensies v. Electric Battery Co.*, 329 U.S. 296, 67 S.Ct. 271, 91 L.Ed. 296 (1946); *Bull v. United States*, 295 U.S. 247, 55 S.Ct. 695, 79 L.Ed. 1421 (1935); *In re Melvin*, 75 B.R. 952, 959–60 (Bankr.E.D.Pa.1987); and *Household Consumer Discount Co. v. Vespaziani*, 490 Pa. 209, 415 A.2d 689 (1980). The claims of the Debtor here appear, as in *Jungkurth*, to be in the substantive form of a recoupment against the Debtor's claim.

In *Andrews*, we established that " 'the business of mortgage lenders is the sale of a service' within the scope of UDAP." 78 B.R. at 82. The broad scope of UDAP, reemphasized in the recent opinion of Chief Judge Twardowski in *In re Aponte; Aponte v. Aungst*, 82 B.R. 738, 746–747 (Bankr.E.D.Pa.1988), and decisions under similar UDAP laws in other jurisdictions, have convinced us that this holding was correct. Therefore, irrespective of the fact that the transaction of July 1, 1986, may have been for business purposes and was a loan rather than a sale does not exclude it from application of UDAP.

We have repeatedly emphasized that summary judgment is a "drastic remedy." *See In re Leedy Mortgage Co.*, 76 B.R. 440, 445 (Bankr.E.D.Pa.1987); *In re American International Airways, Inc.*, 74 B.R. 691, 696 (Bankr.E.D.Pa.1987); and *In re H & H Beverage Distributors, Inc.*, 65 B.R. 243, 244–45 (Bankr.E.D.Pa.1986). On the other hand, we acknowledge recent Supreme Court authority supporting the use of this device where appropriate and taking issue with its characterization as "a disfavored procedural shortcut." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). *See also, e.g. Childers v. Joseph*, 842 F.2d 689, 693–695 (3d Cir.1988) (*Celotex* holding broadened to require opponent of summary judgment to point to facts in the record which precluded granting of the motion).

The Debtor's only UDAP claim pressed at this point is based upon 73 P.S. § 201–7. The significant issue is the almost purely legal issue of the breath of the scope of § 201–7, section (a) of which, relevant to this issue, provides as follows:

§ 201–7. Contracts; effect of rescission

(a) Where goods or services having a sale price of twenty-five dollars ($25) or more are sold or contracted to be sold to a buyer *as a result of, or in connection with, a contract with or call on the buyer at his residence,* that consumer may avoid the contract or sale by notifying, in writing, the seller within three full business days following the day on which the contract or sale was made and by returning or holding available for return to the seller, in its original condition, any merchandise received under the contract or sale. Such notice of rescission shall be effective upon depositing the same in the United States mail or upon other service which gives the seller notice of rescission (emphasis added).

■ The Debtor does not and indeed could not seriously contend that the transaction as of July 1, 1986, was a "door-to-door sale," which is the rather obvious target of this statutory provision. *See Culbreth v. Lawrence J. Miller, Inc.*, 328 Pa.Super. 374, 380–82, 391–92, 477 A.2d 491, 494–95, 501 (1984); and *Commonwealth ex rel. Zimmerman v. Nickel*, 26 D. & C. 3d 115, 124–26 (Mercer Co. C.P.

1983). However, she argues that the statute is broadly drawn and should embrace any transaction where either a "contact with" or "call" at the obligor's residence played any part in the transaction. Clearly, the appraisal, which occurred at the Debtor's home, played a part in the Defendants' decision to make this loan. There is no specific reference in this statute restricting its scope to a "door-to-door sale," which very language appears at the outset in the comparable Federal Trade Commission Rule, 16 C.F.R. § 429.1 (hereinafter referred to as "FTC Rule").[3]

Despite the ingenuity of the Debtor's argument, we are unable to accept it. Section 201-7 is, like any good consumer-protection legislation, drafted with an eye towards ensnaring the wily seller of goods and services who would try to circumvent the statute by engaging in conduct just beyond its scope, e.g., preceding his home visit with other sorts of communications. Is language is broader than the FTC Rule, and it should be. Its obvious aim, by the use of the terms "as a result, of or in connection with" a call on the buyer at home, is to being within its scope transactions where sellers utilize "door-openers" which could arguably be outside of the scope of the FTC Rule because the buyer ultimately invites the seller into the buyer's home before the sale occurs. See, e.g., Federal Trade Comm'n v. Standard Education Society, 302 U.S. 112, 58 S.Ct. 113, 82 L.Ed. 141 (1937); and Encyclopaedia Brittanica, Inc. v. Federal Trade Commission, 605 F.2d 964 (7th Cir.1979).

However, in interpreting § 201-7, we must recognize that the breadth of its wording is meant to prevent the use of devices to circumvent its underlying intention to provide protection in a broad range of "door-to-door" sales. It is not meant to open up every transaction in which a seller of goods or services has any sort of contact at all with the buyer at his residence to the scope of § 201-7. If we adopted the Debtor's interpretation, practically every home sale transaction and refinancing, most of

which would require an in-home appraisal as a condition for consummation, would be within the scope of § 201-7. Also, any home improvement contractor who surveyed the scene of his projected tasks would be within its scope, even if all of the documentation were honestly and carefully put forth and executed in a setting other than in the customer's home. We do not believe that the legislature could have possibly envisioned such frankly bizarre consequences to flow from the enactment of § 201-7.

The only two decisions which appear to have construed § 201-7 are *Culbreth, supra*, and *Nickel, supra*. *Culbreth* does not address the scope of § 201-7 at all, assuming, we think rightly, that the public fire adjusters in issue there were clearly engaging in the common parlance of door-to-door sales of services. However, *Nickel* does address the subject, and holds that the mailings to a consumer's home "which ultimately leads to a contract that is significantly removed from the advertisement in time" are not within the scope of § 201-7. The court also adds, somewhat gratuitously, at 26 D. & C. 3d at 125–26, as follows:

Section 201-7 of the act appears to be directed to the common situation where the door-to-door salesman contacts and consummates a contract at the home of the buyer, usually in the same visit where the buyer has little time to reflect between the contact and signing the contract.

In the instant case, the customer must travel a substantial distance both geographically and in time before he places himself in an environment whereby he is subjected to a sales presentation which may lead to a contract.

Plaintiff invites the court to broadly interpret the language of section 201-7 to include contracts preceded by a remote contact at the residence of the buyer by mail. This court declines that invitation. To adopt such an interpretation would grant the right of rescission under this act to every contract which ultimate-

---

**3.** The Rule begins as follows: "In connection with any door-to-door sale, it constitutes an un-

fair and deceptive practice for any seller to: ..."

ly resulted from advertising received in the home, be it by mail, newspaper, flyer or even through radio or television if plaintiff's logic were carried to its natural conclusion. Obviously, this could not have been the intent of the legislature in enacting section 201–7. Had they so intended, it could have easily been expressly set forth.

We do not read this language as expressing an intention on the part of the *Nickel* court to confine the scope of § 201–7 to door-to-door sales which are consummated by a salesman in one visit. Nor should § 201–7 be so read, as it seems quite clear that the legislature did intend to embrace transactions commenced by "door-openers" within the scope of transactions regulated by § 201–7. We are not herein suggesting that we necessarily concur with the *Nickel* result on the facts presented there. The mailings in issue there may have been property characterized as "door-openers." However, we do concur with the reasoning of the *Nickel* court insofar as it draws some parallel between the type of transaction normally thought to be covered by this statute and the facts before it. Here, the facts before us are so far removed from the normative door-to-door transaction that we must conclude that this transaction is not within the scope of § 201–7.

We therefore conclude that a functional application of summary judgment, as urged by the Supreme Court in *Celotex, supra,* requires us to grant summary judgment to the Defendants as to Debtor's claims, all of which arise out of 73 P.S. § 201–7. An Order consistent with the conclusions set forth in this Memorandum Opinion will be issued.

### ORDER

AND NOW, this 30th day of March, 1988, upon our consideration of the parties' Cross–Motions for Summary Judgment in this proceeding and the Briefs submitted by the parties in support of their respective positions, it is hereby ORDERED AND DECREED as follows:

1. The Motion of the Defendants is GRANTED in part.

2. The Motion of the Debtor is DENIED.

3. The Debtor's remaining claims asserted in this proceeding, and therefore this entire proceeding, are hereby DISMISSED and the file directed to be closed by the Clerk's office.