[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This case involves the presentation, on April 20, 1987, by the plaintiff, Albert DiChello ("DiChello") to Daniel LaTorraca ("LaTorraca"), then branch manager of the defendant Citytrust Bank Corp's ("Citytrust") Cheshire branch of a bank check payable to DiChello in the amount of 20,000,000 lira which check was drawn on Banco Di Napoli ("BDN") in Caserta, Italy. Drawn as it was on a European bank and payable in Italian funds, Citytrust took this item in for collection and forwarded it to their Italian correspondent bank, Banca Commerciale Italian ("BCI") in Milan. Several weeks thereafter Citytrust credited DiChello's account in the amount of $15,396.50. This was a provisional credit and represented the amount in dollars of the 20,000,000 lira at the then exchange rate. After a number of events, referred to below, Citytrust was informed from Italy that the check would not be honored or returned to this country but also that it would be paid only to DiChello as payee or his designee in Italy. Learning this, Citytrust charged back DiChello's account $16,728.90 on December 22, 1987 and informed DiChello of this. DiChello, after claimed demands by him on Citytrust to return his check, went to Italy and to BDN which paid the check to him in lira. Upon his return to this country, he converted the lira so received into dollars at the JFK Airport in New York at an alleged loss of $1,332.00 in the exchange rate. This action seeks to recover money damages for the plaintiff's expenses and business losses occasioned by his trip to Italy, necessitated, he claims by the conduct of Citytrust as well as claiming the recovery of $1,332.00 for the loss on the exchange rate for a total damage claim of $7,508.40.
The allegations of the plaintiff's complaint are all denied except that it admits that it is a Connecticut banking corporation with a branch office in Cheshire. Otherwise, it alleges: that on or about April 1, 1987 the plaintiff submitted for deposit to his account at the defendant's Cheshire branch the 20,000,000 lira check which he owned and which was drawn on BDN, that he did so "upon the advise [sic] of the agents, servants and employees [of Citytrust] that [this check] would be converted to United States dollars and would be deposited to his account," that on December 22, 1987 Citytrust charged his account in the sum of $16,728.90 claiming that the check had been dishonored by BDN, that CT Page 1812 thereafter he demanded the return of the check but Citytrust "refused and neglected to do so,: that Citytrust "would only permit [DiChello] the return of his check by requiring [DiChello] to travel at his expense to . . . [BDN] in Caserta, Italy where he retrieved the ["check"], that because of Citytrust's "failure . . . to either honor or return the [check] the plaintiff was required to expend considerable sums of money for transportation to and from Caserta, Italy, lodgings, meals and to lose time from the operation of his business . . . and as a further consequence of the wrongful acts of [Citytrust], the plaintiff lost the use, enjoyment and interest in his funds and sustained a loss by reason of changes in the exchange rate (lira to U.S. dollars) of $1,388.00"[1]
Citytrust, by way of setoff, alleges that DiChello, after the deposit of this check, was given credit by it for the amount of this check and was credited with interest, that Citytrust could not collect on this check from the BDN and that it incurred expenses in attempting to collect the funds from BDN, the drawee bank.
The plaintiff's complaint sounds in negligence. It does not contain any specific reference to the violation of the Uniform Commercial Code (UCC) General Statutes 42a-1-101 et seq. He argues, however, (in his post-trial brief) that his cause of action is not based upon the instrument but rather is founded upon the wrongful act of the defendant in detaining the plaintiff's "property" and, in making that claim refers to General Statutes42a-3-419[2] and quotes from comment 2[3] to that section. Moreover, the only case citation in his post-trial brief, on this phase of the case, is an Alabama case that involves, among other Alabama derivatives of the UCC, Alabama Code 1975, 7-3-419 which appears to be its counterpart of 41a-3-419 of our statutes. The plaintiff does claim also that the facts justify concluding that a bailor-bailee relationship existed between the parties and that the establishment of the non-return of the bailed item, i.e. the BDN check creates a presumption that the bailee was negligent in dealing with it and that ultimately Citytrust was negligent. Although the plaintiff cites several cases concerning bailments all are in contexts not at all akin to the circumstances of this case.
The trial of this case produced questions of credibility for the court to resolve. The trier of fact determines the credibility of witnesses and the weight to be accorded their testimony and where the evidence is conflicting, its probative force is for the trier of fact to decide. Robert Lawrence Associates, Inc. v. DelVecchio, 178 Conn. 1, 13, 420 A.2d 1142
(1979); McNamee v. Woodbury Congregation of Jehovah's Witnesses,194 Conn. 645, 648, 484 A.2d 940 (1984); Steinman v. Maier, 179 Conn. 574, CT Page 1813 576, 427 A.2d 838 (1988). It may also draw reasonable inferences from the evidence. In re Juvenile Appeal (820AB),188 Conn. 557, 561, 452 A.2d 113 (1982). The trier may believe all or part of the testimony of a witness. State v. Rothenberg,195 Conn. 253, 257, 487 A.2d 545 (1985); Gutowski v. New Britain,165 Conn. 50, 56, 327 A.2d 552 (1979); Rood v. Russo, 161 Conn. 1, 3,285 A.2d 220 (1971). Moreover, the court is not bound by the uncontradicted testimony of any witness, Bieluch v. Bieluch,199 Conn. 550, 555, 509 A.2d 8 (1986); Acheson v. White, 195 Conn. 211,217, 487 A.2d 197 (1985). "Testimony that goes uncontradicted does not thereby become admitted and undisputed; . . . nor does the strength of a witness' belief [in it] raise it to that level." Stanton v. Grigley, 177 Conn. 558, 563, A.2d (1979). The interest of any witness may also be considered on its issue of credibility. Buonanno v. Cameron, 131 Conn. 513, 515, 41 A.2d 107 (1945); Nesbit v. Crosby, 74 Conn. 554, 564, 51 A. 559 (1902).
On April 20, 1987, the plaintiff presented a check payable to him in the amount of 20,000,000 lira drawn on BDN to LaTorraca, the defendant's Cheshire branch manager.
On April 20, 1987, the plaintiff wanted to cash it. LaTorraca told him that he was not familiar with the exchange rate and that the check would have to go to Citytrust's International Department for processing which he indicated would take about two weeks. It was a rare thing for LaTorraca to get at a branch office a check drawn in a foreign bank payable in foreign funds; it happens maybe once a year. Actually this check had been issued to DiChello in person by BDN at their Caserta office when he was in Italy earlier in 1987. It could not be deposited in Citytrust because it was drawn in a foreign bank and payable in foreign funds. LaTorraca, who does not speak or read Italian, took the check for collection, purchased it and discounted it. He forwarded the BDN check itself, by interoffice mail, to the defendant's International Department in Bridgeport on the same day. The check itself, as was necessary, was promptly sent overseas for collection by Dorothy McGann of the defendant's International Department to BCI, its correspondent bank in Italy. LaTorraca, although he had no further information concerning the check, did, on May 18, 1987, give the plaintiff a savings account credit of $15,396.50 on account of this check. He did so assuming that the check had been honored; this was not in accordance with the defendant's policy which was not to credit such an account until it had received the funds from the foreign bank.
Some time thereafter, perhaps early in June 1987, the defendant's International Department received a communication from its correspondent BCI acknowledging its receipt of the check enclosed in the defendant's cash letter of April 22, 1987. This BCI letter which was dated May 27, 1987 informed it that the CT Page 1814 "item" (the BDN check) ". . . has been circulated abusively ahead" and that consequently and "in connection with Italian currency regulations . . ." BCI was remitting ". . . the original cheque to the drawee bank [BDN] that shall contact you [Citytrust] directly." That serves as a "red flag" and indicates that there is a problem involved with the check. After receiving that communication from BCI, McGann spoke to LaTorraca and notified him that there were problems on Citybank's collecting on the check. On June 25, 1987, the defendant put a hold on the plaintiff's account; the plaintiff had not withdrawn any money from the account up to that time. By a letter to the defendant dated June 23, 1987 which was received on July 1, 1987, BDN wrote defendant's International Department acknowledging receipt of the 20,000,000 lira check forwarded to BCI on April 22, 1987. That letter informed the defendant that ". . . the Exchange Control Regulations in force in our country prevent the italian bank from crediting the relative amount without the prescribed authorization as the Italian checks are not allowed to circulate abroad. Therefore we are obliged to point out the transaction to Italian Exchange Authorities." The letter also asked "In the meantime" that the defendant get BDN the following information: "1) the complete name of the check's bearer and if he is resident in Italy or abroad; 2) the reason for which the bearer came in possession of the check stating the origin of funds." McGann spoke to LaTorraca over the telephone about this and by interoffice mail dated July 7, 1987 sent this letter and the BCI letter of May 22, 1987 to LaTorraca. In that interoffice communication McGann asked LaTorraca to get the information requested and return it to her attention. LaTorraca thereafter, having spoken to the plaintiff, wrote McGann that in 1983 the plaintiff had sold his home and business in the United States and had intended to move back to Italy. The plaintiff, however, after arriving in Italy changed his mind and moved back to the United States, and he also indicated that the proceeds of "this check was from the sale of his business [and] home in the U.S.A." LaTorraca also informed McGann that the plaintiff was a citizen of the United States.
Thereafter, by communication, dated July 27, 1987, McGann forwarded this information to BDN. By a telex, dated August 13, 1987, Citytrust wired BDN "Pls. urgently advise status by wire."[4]
Having received no answer, Citytrust again, by telex dated September 4, 1987, wired BDN "Please confirm urgently if funds paid to our account, Banca Italiano Commerciale, Milano." By letter dated August 9, 1987, but not received by Citytrust's International Department until September 15, 1987, BDN wrote requesting certain documents "in order to reply to Italian Exchange authorities" and these were: 1) "certificate of resident abroad of beneficiary signed by Italian Consul"; 2) "certificate of cancellation from the Registrar of Italian People issued by the last residence's authority"; 3) copy of the contract concerning CT Page 1815 the sale of home in USA; [and] 4) the document "stating the way through which the relative funds were transferred in Italy." By interoffice communication dated September 21, 1987, Citytrust's International Department forwarded this correspondence to its Cheshire branch to LaTorraca's attention. When he received this request for documentation, LaTorraca told the plaintiff that BDN was still holding the check and had to make a report to the Italian authorities. LaTorraca, however, left Citytrust's employ on October 1, 1987, without having been given the requested documentation by the plaintiff.
After LaTorraca left, Carol Ingala became the branch manager at Cheshire. When she did, Stella Withers, who is no longer with Citytrust, also worked there and she apparently handled this matter after LaTorraca left. Ingala, however, did not learn this until November or December 1987. In any event McGann, under date of October 21, 1987, wrote the following on September 15, 1987 letter to BDN: "Mr. DiChello is going to call Italian bank to clarify required documents needed as he did not buy or sell property in U.S. or Italy. He revisited three or four years ago, has not resided since 15 years ago. Stella at 23 will advise regional manager after his vacation regarding charging back customer or leaving hold on account, over." There is another note in McGann's writing dated November 4, 1987 "Stella called Mr. DiChello for status. He will get back to her."
On November 17, 1987, defendant's International Department wired BDN asking . . . "immediate return by certified mail [of the check] to Citytrust International Department . . . as [check is] still unpaid by yourselves [BDN]." Receiving no reply, Citytrust again, on December 4, 1987, by wire to BDN requested that BDN "confirm by tlx (telex) immediately yr [your] return . . . check by certified mail per our 11-17-87 instructions as check still unpaid by you [BDN]." On December 4, 1987, Citytrust International Department also received a letter, not a wire or telex, from BDN, dated November 25, 1987, which, inter alia, stated that Italian Exchange Control Regulations prevent Italian banks "from returning [a check of this sort] to the remitting foreign bank," as such checks "are not allowed to circulate abroad." It further said that the "funds concerning the. [plaintiff's] check become available only in Italy, unless the Italian Exchange Authorities authorize the transfer of funds favour of yourselves in the ground of the documentation showed." It concluded that "For the reason given above, please let us have the following documents . . ." and it again requested the same four documents it had asked for in its letter of September 8, 1987.
On December 4, 1987, McGann, having ascertained from defendant's legal counsel that it would be prudent to get the CT Page 1816 plaintiff's cooperation in permitting Citytrust to charge back his account, i.e. debiting his account with the U.S. equivalent in dollars of the amount of the check, called Stella at Cheshire about this. On December 15, 1987, Stella reached DiChello and he said that he would call her back. On December 22, 1987, Citytrust did charge back the plaintiff's account in the amount of $16,728.90. By letter of that date Carol Ingala wrote to the plaintiff stating that the charge back of $16,728.90 represented the credit originally given him plus the loss due to change in the exchange rate. That letter, which also attached copies of the correspondence from BDN, also stated that "Exchange Control regulations in effect at present in Italy prevent this check from being honored or returned to us at Citytrust." Shortly thereafter the plaintiff demanded the return of the check for the 20,000,000 lira from the defendant and apparently retained counsel.
By letter dated January 7, 1988, McGann, on behalf of Citytrust, wrote plaintiff's then counsel (with a copy to the plaintiff) relating their purchase of the check from the plaintiff, their unsuccessful efforts to obtain the return of the original check from DBN, the charge back of his account, and the documents that BDN requested from the plaintiff which he had still not furnished. It also indicated that Citytrust could again request by wire that BDN return the check or "advise [Citytrust] in both English and Italian why they cannot do so in order to possibly make its status clearer to Mr. DiChello." McGann also pointed out that "considering [BDN's] past history of always responding by mail, we cannot guarantee their wire response." This letter concluded by asking counsel to inform Citytrust if, after speaking to the plaintiff, he wanted Citytrust to contact BDN as outlined in the letter. Apparently shortly thereafter the plaintiff retained present counsel, who in January 1988, was briefed at length by defendant's counsel on the entire history of the matter as well as being given copies of relevant correspondence.
On January 13, 1988, Citytrust sent a telex to BDN in Italy stating in part: "We transfer title and any or all rights to . . . check to the named payee, Mr. Alberto Dichello or his nominee who wish to retrieve check at your office. If acceptable please inform this office urgently by tested Telex what requirements must be met by payee or nominee at your office to facilitate release of check." During conversations between Citytrust's counsel and plaintiff's present counsel in January 1988, plaintiff's counsel informed her that it would be difficult for the plaintiff to provide the requested documentation but that he did visit family and friends in Italy from time to time and so the plaintiff was going to leave the funds represented by the check in Italy and use it when he visited Italy rather than taking additional funds with him on such a visit. CT Page 1817
On February 16, 1988, Citytrust wrote plaintiff's counsel enclosing a letter, dated January 29, 1988, from BDN in which BDN stated that it "would release . . . the check only to Mr. Alberto DiChello at our office in Italy, as the italian checks are not allowed to circulate abroad." It also requested that Citytrust telex the number of plaintiff's passport or any equivalent document to the plaintiff, "so we can identify him and pay the relative funds." On February 24, 1988, defendant's International Department telexed to BDN the information it received from plaintiff's counsel enclosing a photocopy of the plaintiff's passport and its number.
DiChello flew to Rome on March 11, 1988 and dove to Caserta where he went to BDN. That bank cashed the 20,000,000 lire check. On March 19, 1988 he returned to the United States to JFK Airport in New York. Upon his arrival at JFK he converted the lira received in Italy to American dollars, receiving $15,384.61. This action followed.
We turn first to the plaintiff's claim involving the UCC where he argues that the defendant was under an obligation to return the plaintiff's instrument (check) upon demand and that the failure to do so constitutes a conversion. Here he refers to42a-3-419 (a)(1) where that provides "An instrument is converted when . . . (b) any person to whom it is delivered for payment refuses on demand either to pay it or to return it. . . ." He maintains that when he demanded the return of his check the "detention" of the check became wrongful. He further maintains that his cause of action is not based on the instrument (check) but rather upon the defendant's wrongful action in detaining his property. The court does not agree as it concludes below that the plaintiff has not proven that the Citytrust is guilty in conversion under the UCC or under the common law.
"Conversion is usually defined to be an unauthorized assumption and exercise of the right of ownership over goods belonging to another, to the exclusion of the owner's rights. . . . It is some unauthorized act which deprives another of his property permanently or for an indefinite time; some unauthorized assumption and exercise of the powers of the owner to his harm. The essence of the wrong is that the property rights of the plaintiff have been dealt with in a manner adverse to him, inconsistent with his right of dominion and to his harm. Gilbert v. Walker, 64 Conn. 390, 394, 30 A. 132 [1094]," Devitt v. Manulik, 176 Conn. 657, 660, 410 A.2d 465 (1979); see VanDerlip v. VanDerlip, 149 Conn. 285, 289, 179 A.2d 619 [1962]; Coleman v. Francis, 102 Conn. 612, 129 A. 718 (1925); Tassinary v. Moore,38 Conn. Sup. 327, 330, 446 A.2d 13 (1981). CT Page 1818
We now turn to the duty that the Citytrust owed the plaintiff customer in the unusual circumstances of this case. Citytrust, having received the check for processing which the plaintiff well understood meant steps to be taken to convert into dollars was the "collecting bank" which "means any bank handling the item [check] for collection except the payor bank." General Statutes 42a-4-105(d). BCI was the "presenting bank" which "means any bank presenting an item except a payor bank." General Statutes 42a-4-105(e). BDN was the "payor bank" which "means a bank by which an item is payable as drawn or accepted." General Statutes 42a-4-105(b).
As the collecting bank Citytrust was held to a standard of ordinary care and owed that duty to the plaintiff. See General Statutes 42a-4-202; See generally Sheiman v. Lafayette Bank Trust Co., 4 Conn. App. 39, 44-45, 492 A.2d 219 (1985). "`Ordinary care' is by definition a reasonableness standard whose application varies with the circumstances." Krull v. Keene Corporation, 601 F. Sup. 547, 548 (N.D.Ill. 1985), see Prosser and Keeton, Law of Torts, 34aI 209 (5th ed. 1984). "Ordinary care" or for that matter "negligence" is not defined in the UCC. Our Supreme Court, however, in speaking to another portion of our UCC, under "Commercial Paper," has recognized the interchangeable nature of "negligence" as meaning "the failure to exercise `reasonable' or `ordinary care'" as well as saying that "By using `reasonable care' in cases involving a question of negligence we mean the care which `the ordinary prudent person under the circumstances' would exercise." Fidelity Casualty Co. v. Constitution National Bank, 167 Conn. 478, 483, 356 A.2d 117
(1975) referring to 42a-3-406; see also Perley v. Glastonbury Bank Trust Co., 170 Conn. 691, 368 A.2d 147 (1976): Sheiman v. Lafayette Bank Trust Co., supra. The burden of proof is upon the plaintiff to prove the requisite lack of "ordinary care," i.e. negligence by Citytrust.
We have been at length to set out the unique factual circumstances of this case. They do not demonstrate that Citytrust did not exercise ordinary care and was negligent. Quite the contrary, they demonstrate its promptness in instituting collection and diligence with which they pressed for collection, the reasonableness of all their efforts to collect on this item including their attempts to obtain more expeditious responses and action from BDN. Here we are aware that Citytrust having immediately forwarded the check itself as required overseas, was dealing with a European banking institution in a setting where the latter was not bound by our law including the UCC but was operating under strict Italian foreign exchange regulations. Citytrust asked BDN to respond quickly by telex but it never did always communicating by letter. As soon as Citytrust learned that there was a problem with the check, it reasonably endeavored to do CT Page 1819 what it could. Accordingly, when BDN requested certain information which could be obtained from the plaintiff, Citytrust contacted him, informed him and endeavored to get it so as to forward it overseas to BDN. The failure of the plaintiff to furnish certain requested information has already been set out. Parenthetically, we note here that on the back of this check the plaintiff had endorsed his name. There was also printed on the back of it a statement in the Italian language which was translated at the trial to mean: "The presented document could circulate only in Italy." When questioned about this language on the check (which he had obtained in person at BDN in April, 1987) he said that he did not pay any attention to that language.
The plaintiff may not avoid the consequences of attempting to convert into United States dollars the 20,000,000 lira check which he brought to the defendant for that specific purpose where, under the circumstances the defendant discharged the duty of ordinary care which it owed to the plaintiff. The plaintiff knew as a matter of fact that when he demanded the return of the check shortly after December 22, 1987 that the defendant could not possibly return the check itself. Moreover, it merits comment that the plaintiff is intelligent and appears to be a successful businessman. He enjoys both U.S. and Italian citizenship and has traveled to Italy on a number of occasions since 1980. He came to this country in 1972 when he was about thirty years old and had operated a business in Italy with his brother. He is now in the construction business and also owns a gas station with a three bay repair garage. In either 1983 or 1984 he owned another gas station and a home which he sold sometime later. The plaintiff was then considering moving back to Italy, went over there early in 1987 but decided to come back to this country. Prior to 1987 and after selling his home and gas station in this country he had taken a trip to Italy and he deposited some of the money from those sales in the BDN and he also had earlier deposited some of the money from the earlier sale of his business in Italy in BDN. He did inform the defendant of this latter fact so that the funds in BDN included funds of his that stemmed from his earlier Italian business dealings as well as from the sale of assets in this country.
The prima facie presumption of Citytrust's agency for the plaintiff customer under General Statutes 42a-4-201(1) continued in this case at the very least down to December 22, 1987 when Citytrust charged back to his account on its provisional settlement or credit earlier given to the plaintiff because then Citytrust definitely knew that BDN would not honor this check as presented. This presumption "states a rule of status [between the plaintiff and defendant] in terms of a strong presumption" and this presumption "applies . . . even though credit given for the item [check] is subject to immediate withdrawal as of right or is CT Page 1820 in fact withdrawn; that the continuance of ownership of an item by its owner and any rights of the owner to proceeds of the item are subject to the rights of the collecting bank such as those resulting from outstanding on the item and valid rights of setoff. . . ." General Statutes 42a-4-201 and UCC comment therein. This presumption was not rebutted. Thus, it is seen that this statute keeps the risk of loss upon the customer rather than the bank. General Statutes 42a-4-201, see In Re United Sciences of America, Inc ., 84 B.R. 49 (Bkcy Ct. N.D.Texas 1988). In other words, the risk of loss stays on the customer until the item (check) is finally paid and, if it is not, the bank is not left without remedy where the bank does not ultimately receive final payment. See Southside Nat. Bank v. Hepp, 739 S.W.2d 720, 722 (Mo. 1987). To hold, therefore, that the bank could not charge back the plaintiff's account as it did would mean that the bank would, in effect, be guaranteeing the plaintiff's check when it had only extended a provisional credit to his account in the first instance. Where a collecting bank has exercised ordinary care, as did Citytrust, it cannot be held liable for the "neglect" of another bank. See General Statutes 42a-4-202(3).
In addition to what has been said about the tort of conversion generally, see Devitt v. Manalik, supra, we note that even where a person may initially be in possession of property rightfully, he may still be liable for conversion if he refuses the rightful owner's demand for the property. 470 West End Corp. v. East River Savings Bank, 424 N.Y.S.2d 859, 860-861 (1980); CBS., Inc. v. Allen, 108 F.R.D. 14, 26 (S.D.N.Y. 1985), 18 Am.Jur.2d Conversion, 47, 84, Possession, "originally rightful, becomes wrongful by reason thereafter of a wrongful detention, or a wrongful use of the property or the exercise of an unauthorized dominion over the property." Coleman v. Francos, supra 615, 616; see Horelik v. Roth, 15 Conn. App. 641, 650, 652, A.2d (1988), there can be no conversion until the possessor refuses to deliver up the property upon demand and "unexplained, the refusal is evidence from which conversion may be found," Coleman v. Francis, supra (emphasis added). The demand, however, must be reasonable. See LFC Leasing Financial Corporation v. Ashulot National Bank,419 A.2d 1120, 1121 (N.H. 1980) as should the refusal to deliver upon demand. See, e.g. Mueller v. Technical Devices Corp.,84 A.2d 620, 625 (N.J. 1951); Whiting v. Whiting, 87 A. 381 (M.E. 1913).
When demand was made by the plaintiff he knew that the defendant did not have possession of the check and he knew that the defendant had months prior thereto dispatched the very check itself overseas diligently and timely into the collection stream to process it in fulfilling the purpose for which the check was originally given to the defendant by him. This demand was unreasonable and the defendant's "refusal" was reasonable, it was CT Page 1821 hardly "unexplained." See Coleman v. Francis, supra. The defendant Citytrust had acted in a commercially reasonable manner and had used ordinary care throughout. It was impossible for it to hand over the check it did not have and the possession of which it had given up in order to fulfill its undertaking with the plaintiff. There was no wrongful detention, no conversion either under the UCC or the common law.
Before leaving this branch of the matter any delay in securing payment of the plaintiff's check is found excused, in view of the good faith and diligent efforts by Citytrust to secure payment, the refusal or inability of BDN to pay the check itself a significant circumstance beyond the control of the defendant. In passing we note the plaintiff's failure to furnish the documentation requested by Citytrust. See General Statutes 42a-4-108. Moreover, Citytrust continued to exercise ordinary care in its efforts after December 22, 1987 to expedite the plaintiff's ability to have the check processed.
In sum, the court concludes that the plaintiff has not proven that the defendant converted his check as claimed either under the UCC or the common law
 II.
The plaintiff also appears to claim that a bailment existed in this case and that "the establishment of the non-return of the bailed item [the plaintiff's check] creates a presumption that the bailor was negligent in dealing with the bailed item" and that the defendant was negligent. The court does not agree.
A bailment has been defined as "a delivery of goods in trust, upon a contract, express or implied, that the trust shall be duly executed, and the goods restored by the bailee, as soon as the purpose of the bailment shall be assured." Zeterstrom v. Thomas, 92 Conn. 704 A (1918); Hartman v. Black Decker Mfg. Co.,16 Conn. App. 1, 6, 7 A.2d (1988). "The essential element of bailment is the express or implied assumption of control over the property by the bailee." Lissie v. Southern New England Telephone Co., 33 Conn. Sup. 540, 543, 359 A.2d 187 (1976). "`The duties and liabilities of the bailor and bailee are generally determined according to the character of the bailment as one for mutual benefit, gratuitous. . . D. Wright J. Fitzgerald, Connecticut Law of Torts (2d Ed) 84, p. 181. Accordingly, bailments are now generally classified as (1) Those for the sole benefit of the bailor, (2) those for the sole benefit of the bailee and (3) those for the mutual benefit of the parties. Id. "Hartman v. Black Decker Mfg. Co., supra 7. Any bailment here can be said to be one for the mutual benefit of the parties as it would appear both stood to receive a benefit from this arrangement." The standard CT Page 1822 of care required of a bailor in a mutual benefit bailment is due care." Lissie v. Southern New England Telephone Co., supra. Barnett Motor Transportation Co. v. Cummins Diesel Engines of Connecticut, Inc., 162 Conn. 59, 63, 291 A.2d 234 (1971).
Even if a bailment could be said to exist, when Citytrust was shown not to have returned the plaintiff check, then a presumption arose that the nonproduction was due to the bailee's negligence. Frissel v. John son Rogers, Inc., 141 Conn. 308, 310,106 A.2d 162 (1954). This presumption prevails unless and until the bailee proves the actual circumstances involved in the "loss" and if such circumstances are proven, then the burden is on the bailor to satisfy the court that the bailee's conduct in the matter constituted negligence. Griffin v. Nationwide Moving Storage Co., 187 Conn. 405, 409, 446 A.2d 799 (1982). Our Supreme Court has noted that the presumption in favor of the bailor persists "until the bailee not only produced substantial contravening evidence but proves the actual circumstances involved in the loss of the property." (emphasis added) Barnett Motor Transportation Co. v. Cummins Diesel Engines of Connecticut Inc., supra, 64. "Griffin v. Nationwide Moving Storage Co., supra 409-410. It is a question of fact for the trier to determine whether the bailee has proved the actual circumstances of the loss and rebutted the presumption of negligence in that the bailee took reasonable precautions concerning the "loss" under the circumstances. Id 410.
Assuming, not only that a bailment existed, but also the scenario most favorable to the plaintiff, that Citytrust's nonproduction of the plaintiff's check constituted "loss" or "damages" to the plaintiff, then the burden of rebutting the presumption is on Citytrust. From the facts already found this court determines, as a fact, that Citytrust appropriately rebutted that presumption and that the burden was thereby cast upon the plaintiff to prove that Citytrust has not exercised due care. That burden has not been sustained by the plaintiff who, therefore, was not negligent.
It is, therefore, unnecessary to reach the issue of damages in this case.
Accordingly, the issues are found for the defendant as to the complaint and judgment is entered for the defendant Citytrust.
Arthur H. Healey State Trial Referee
FOOTNOTES